# ALFRED DUNHILL OF LONDON, INC. *v.* REPUB-
# LIC OF CUBA ET AL.

No. 73–1288.   Argued December 10, 1974—Reargued January 19, 1976—Decided May 24, 1976

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS (except for Part III), JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 715. STEVENS, J., filed a concurring statement, *post*, p. 715. MARSHALL, J., filed a dissenting opinion in which BRENNAN, STEWART, and BLACKMUN, JJ., joined, *post*, p. 715.

*Victor S. Friedman* reargued the cause and filed a supplemental brief for the petitioner. With him on the brief on the original argument was *Peter D. Ehrenhaft.*

*Victor Rabinowitz* reargued the cause for respondents. With him on the briefs on reargument were *Michael Krinsky* and *Dorian Bowman.* With him on the brief on the original argument was *Mr. Bowman.*

*Antonin Scalia* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Bork, Assistant Attorney General Lee, Deputy Solicitor General Jones,* and *Bruno A. Ristau.**

MR. JUSTICE WHITE delivered the opinion of the Court.†

The issue in this case is whether the failure of respondents to return to petitioner Alfred Dunhill of London, Inc. (Dunhill), funds mistakenly paid by Dunhill for cigars that had been sold to Dunhill by certain expropriated Cuban cigar businesses was an "act of state" by Cuba precluding an affirmative judgment against respondents.

I

The rather involved factual and legal context in which this litigation arises is fully set out in the District Court's

---

*\*Robert B. Fiske, Jr.,* and *Wilmot R. Hastings* filed a brief for the Bank of Boston International as *amicus curiae* urging reversal.

†Part III of this opinion is joined only by THE CHIEF JUSTICE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST.

opinion in this case, *Menendez* v. *Faber, Coe & Gregg, Inc.,* 345 F. Supp. 527 (SDNY 1972), and in closely related litigation, *F. Palicio y Compania, S. A.* v. *Brush,* 256 F. Supp. 481 (SDNY 1966), aff'd, 375 F. 2d 1011 (CA2), cert. denied, 389 U. S. 830 (1967). For present purposes, the following recitation will suffice. In 1960, the Cuban Government confiscated the business and assets of the five leading manufacturers of Havana cigars. These companies, three corporations and two partnerships, were organized under Cuban law. Virtually all of their owners were Cuban nationals. None were American. These companies sold large quantities of cigars to customers in other countries, including the United States, where the three principal importers were Dunhill, Saks & Co. (Saks), and Faber, Coe & Gregg, Inc. (Faber). The Cuban Government named "interventors" to take possession of and operate the business of the seized Cuban concerns. Interventors continued to ship cigars to foreign purchasers, including the United States importers.

This litigation began when the former owners of the Cuban companies, most of whom had fled to the United States, brought various actions against the three American importers for trademark infringement and for the purchase price of any cigars that had been shipped to importers from the seized Cuban plants and that bore United States trademarks claimed by the former owners to be their property. Following the conclusion of the related litigation in *F. Palicio y Compania, S. A.* v. *Brush, supra,*[1] the Cuban interventors [2] and the Republic

---

[1] When the prior owners sued the importers, the interventors and the Republic of Cuba brought separate litigation against the prior owners' attorneys seeking to restrain the further prosecution of the actions brought by the prior owners. The interventors

of Cuba were allowed to intervene in these actions, which were consolidated for trial. Both the former owners and the interventors had asserted their right to some $700,000 due from the three importers for postintervention shipments: Faber, $582,588.86; Dunhill, $92,949.70; and Saks, $24,250. It also developed that as of the date of intervention, the three importers owed sums totaling $477,200 for cigars shipped prior to intervention: Faber, $322,000; Dunhill, $148,600; and Saks, $6,600. These latter sums the importers had paid to interventors subsequent to intervention on the assumption that interventors were entitled to collect the accounts receivable of the intervened businesses. The former owners claimed title to and demanded payment of these accounts.

Based on the "act of state" doctrine which had been reaffirmed in *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964), the District Court held in *F. Palicio y Compania, S. A.* v. *Brush, supra,* and here, that it was required to give full legal effect to the 1960 confiscation of the five cigar companies insofar as it purported to take the property of Cuban nationals located within Cuba. Interventors were accordingly entitled to collect from the importers all amounts due and unpaid with respect to shipments made after the date of intervention. The contrary conclusion was reached as to the accounts owing at the time of intervention: Because the United States

---

were there held entitled to the proceeds of sales made to American buyers after intervention but the prior owners' trademark litigation was permitted to continue. *F. Palicio y Compania, S. A.* v. *Brush.*

[2] Prior to intervening in this lawsuit, interventor-respondent Pinera had replaced the original interventors as to the five companies on whose behalf he has pursued this suit. For convenience' sake we will refer to those representing the tobacco businesses as "interventors" both in discussing their conduct prior to the lawsuit and in discussing the single interventor's conduct as a party to the lawsuit.

courts will not give effect to foreign government confiscations without compensation of property located in the United States and because under *Republic of Iraq* v. *First Nat. City Bank,* 353 F. 2d 47 (CA2 1965), cert. denied, 382 U. S. 1027 (1966), the situs of the accounts receivable was with the importer-debtors, the 1960 seizures did not reach the preintervention accounts, and the former owners, rather than the interventors, were entitled to collect them from the importers—even though the latter had already paid them to interventors in the mistaken belief that they were fully discharging trade debts in the ordinary course of their business.

This conclusion brought to the fore the importers' claim that their payment of the preintervention accounts had been made in error and that they were entitled to recover these payments from interventors by way of set-off and counterclaim. Although their position that the 1960 confiscation entitled them to the sums due for preintervention sales had been rejected and the District Court had ruled that they "had no right to receive or retain such payment," [3] interventors claimed those payments on the additional ground that the obligation, if any, to repay was a quasi-contractual debt having a situs in Cuba and that their refusal to honor the obligation was an act of state not subject to question in our courts. The District Court rejected this position for two reasons. First, the repayment obligated was more properly deemed situated in the United States and hence remained unaffected by any purported confiscatory act of the Cuban Government. Second, in the District Court's

---

[3] The District Court also disagreed with interventors that there was insufficient evidence to show that they had actually received the sums assertedly paid them by the importers. Neither could the District Court agree that the importers, if they were entitled to the funds at all, were entitled to be repaid only in pesos. The Court of Appeals did not disturb these holdings.

view, nothing had occurred which qualified for recognition as an act of state:

> "[T]here was no formal repudiation of these obligations by Cuban Government decree of general application or otherwise. . . . Here, all that occurred was a statement by counsel for the interventors, during trial, that the Cuban Government and the interventors denied liability and had refused to make repayment. This statement was made after the interventors had invoked the jurisdiction of this Court in order to pursue their claims against the importers for post-intervention shipments. It is hard to conceive how, if such a statement can be elevated to the status of an act of state, *any* refusal by *any* state to honor *any* obligation at *any* time could be considered anything else." 345 F. Supp., at 545.

The importers were accordingly held entitled to set off their mistaken payments to interventors for preintervention shipments against the amounts due from them for their post-intervention purchases. Faber and Saks, because they owed more than interventors were obligated to return to them, were satisfied completely by the right to setoff. But Dunhill—and at last we arrive at the issue in this case—was entitled to more from interventors—$148,000—than it owed for postintervention shipments—$93,000—and to be made whole, asked for and was granted judgment against interventors for the full amount of its claim, from which would be deducted the smaller judgment entered against it.

The Court of Appeals, *Menendez* v. *Saks & Co.*, 485 F. 2d 1355 (CA2 1973), agreed that the former owners were entitled to recover from the importers the full amount of preintervention accounts receivable. It also held that the mistaken payments by importers to inter-

ventors gave rise to a quasi-contractual obligation to repay these sums. But, contrary to the District Court, the Court of Appeals was of the view that the obligation to repay had a situs in Cuba and had been repudiated in the course of litigation by conduct that was sufficiently official to be deemed an act of state: "[I]n the absence of evidence that the interventors were not acting within the scope of their authority as agents of the Cuban government, their repudiation was an act of state even though not embodied in a formal decree." [4] *Id.*, at 1371. Although the repudiation of the interventors' obligation was considered an act of state, the Court of Appeals went on to hold that *First Nat. City Bank* v. *Banco Nacional de Cuba*, 406 U. S. 759 (1972), entitled importers to recover the sums due them from interventors by way of set-off against the amounts due from them for postintervention shipments. The act of state doctrine was said to bar the affirmative judgment awarded Dunhill to the extent that its claim exceeded its debt. The judgment of the District Court was reversed in this respect, and it is this action which was the subject of the petition for certiorari filed by Dunhill. In granting the petition, 416 U. S. 981 (1974), we requested the parties to address certain questions,[5] the first being whether the statement by

---

[4] The Court of Appeals rejected the importers' contention that the Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U. S. C. § 2370 (e) (2), precluded interventors from invoking the act of state doctrine. The correctness of that judgment is not before us in this litigation.

[5] Our order granting certiorari directed counsel to brief and argue two questions:

"1. Can statements by counsel for the Republic of Cuba, that petitioner's unjust enrichment counterclaim would not be honored, constitute an act of state?

"2. If so, is an exception to the act of state doctrine created, under *First National City Bank* v. *Banco Nacional de Cuba*, 406 U. S. 759 (1972), where petitioner's counterclaim does not exceed

counsel for the Republic of Cuba that Dunhill's unjust-enrichment claim would not be honored constituted an act of state. The case was argued twice in this Court. We have now concluded that nothing in the record reveals an act of state with respect to interventors' obligation to return monies mistakenly paid to them. Accordingly we reverse the judgment of the Court of Appeals.

## II

The District Court and the Court of Appeals held that for purposes of this litigation interventors were not entitled to the preintervention accounts receivable by virtue of the 1960 confiscation and that, despite other arguments to the contrary, nothing based on their claim to those accounts entitled interventors to retain monies mistakenly paid on those accounts by importers. We do not disturb these conclusions.[6] The Court of Appeals nevertheless observed that interventors had "ignored" demands for the return of the monies and had "fail[ed]

---

the net balance owed to Cuba on its claims by petitioner's codefendants, and where all claims and counterclaims arise out of the subject matter in litigation in this case?"

When the case was restored to the calendar for reargument, 422 U. S. 1005 (1975), the Court directed:

"In addition to other questions presented by this case, counsel are requested to brief and discuss during oral argument: Should this Court's holding in *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964), be reconsidered?"

[6] In addition to the present petition the Court has before it the petition of the interventors, *Republic of Cuba* v. *Saks & Co.,* No. 73–1287, challenging, on the ground that the intervention successfully seized the accounts receivable and that the $477,000 properly belonged to them, the propriety of permitting even a setoff, and the conditional cross-petition of the importers, *Saks & Co.* v. *Republic of Cuba,* No. 73–1289, challenging the propriety of the judgment against them and in favor of the owners for the $477,000 due on preintervention shipments. Today we deny these petitions, *post,* p. 991.

to honor the importers' demand (which was confirmed by the Cuban government's counsel at trial)." This conduct was considered to be "the Cuban government's repudiation of its obligation to return the funds" and to constitute an act of state not subject to question in our courts.[7] *Menendez* v. *Saks & Co.*, 485 F. 2d, at 1369, 1371. We cannot agree.

If interventors, having had their liability adjudicated and various defenses rejected, including the claimed act of state, with respect to preintervention accounts, represented by the Cuban confiscation in 1960, were nevertheless to escape repayment by claiming a second and later act of state involving the funds mistakenly paid them, it was their burden to prove that act. Concededly, they declined to pay over the funds; but refusal to repay does not necessarily assert anything more than what interventors had claimed from the outset and what they have continued to claim in this Court—that the preintervention accounts receivable were theirs and that they had no obligation to return payments on those accounts.[8] Neither does it demonstrate that in addition

---

[7] The traditional formulation of the act of state doctrine is that in *Underhill* v. *Hernandez*, 168 U. S. 250, 252 (1897):

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

[8] Their entitlement to the $477,000 derived under this theory from the initial act of state—*i. e.,* the intervention of the owners' business. All parties agree that intervention is to be given effect with respect to all of the owners' tangible property in Cuba at the time of intervention. The Court of Appeals held, however, that since the accounts receivable were not in Cuba at the time of intervention, the intervention did not reach them. The dissent points to a statement by trial counsel that when Dunhill's money arrived in Cuba *after* the intervention "the Cuban government took this

692

to authority to operate commercial businesses, to pay their bills and to collect their accounts receivable, interventors had been invested with sovereign authority to

money and under the act of state doctrine it belongs to the Cuban government." The statement was made during counsel's closing argument in the District Court and is not and does not purport to be a *factual* representation that a second act of state occurred. Indeed in his brief in this Court the same counsel states "counsel's in-court statements were 'no more than statements of a litigating position,'" Brief for Respondents 16, and "The statement of . . . a lawyer is not proof of anything." *Id.*, at 17 n. 8. Indeed, if counsel's statements were proof of anything, petitioner would have been entitled to cross-examine him under oath. As a legal argument that the original act of state automatically matured when Dunhill's money arrived in Cuba and transformed the account receivable from an intangible to a tangible asset, the statement was rejected by the Court of Appeals, which held that the original intervention did not seize the accounts receivable from the prior owners even with respect to accounts later paid by Dunhill. Finally, we are unwilling, absent proof, to infer from the fact that Cuba seized the assets of the cigar business from Cuban nationals that it must necessarily have intended to make and did make a later discriminatory and confiscatory seizure of money belonging to the United States companies. Indeed, respondents have argued vigorously before this Court that no international law issue is raised precisely because "[a]ll of the acts of the Cuban sovereign have been directed at its nationals . . ." and "there was no intent to divest Dunhill of ownership." Brief for Respondents on Reargument 4–5. In supporting its conclusion that Cuba necessarily did intend to seize Dunhill's money when it arrived in Cuba, the dissent quotes a remark by counsel—in the third brief filed in this Court by respondents—that they had contended below that the "refusal to acquiesce in the quasi-contractual obligation sought to be imposed by a foreign court, was . . . an act of state." Once again, this is merely a statement of respondents' incorrect litigating position that the failure to pay Dunhill established a refusal by Cuba to acquiesce in an admitted obligation and was therefore an act of state. The litigating position is incorrect because, as stated *supra*, at 691, respondents have never admitted an obligation to Dunhill and therefore their failure to pay Dunhill, without more, is inadequate to establish a sovereign repudiation of such an obligation.

repudiate all or any part of the debts incurred by those businesses. Indeed, it is difficult to believe that they had the power selectively to refuse payment of legitimate debts arising from the operation of those commercial enterprises.

In *The "Gul Djemal,"* 264 U. S. 90 (1924), a supplier libeled and caused the arrest of the *Gul Djemal*, a steamship owned and operated for commercial purposes by the Turkish Government, in an effort to recover for supplies and services sold to and performed for the ship. The ship's master, "a duly commissioned officer of the Turkish Navy," *id.*, at 94–95, appeared in court and asserted sovereign immunity, claiming that such an assertion defeated the court's jurisdiction. A direct appeal was taken to this Court, where it was held that the master's assertion of sovereign immunity was insufficient because his mere representation of his government as master of a commercial ship furnished no basis for assuming he was entitled to represent the sovereign in other capacities.[9] Here there is no more reason to suppose that the interventors possess governmental, as opposed to commercial, authority than there was to suppose that the master of the *Gul Djemal* possessed such authority. The master of the *Gul Djemal* claimed the authority to assert sovereign immunity while the interventors claim that they

---

[9] *"The Anne,* 3 Wheat. 435, reaffirmed by *The Sao Vicente,* 260 U. S. 151, is enough to show that the immunity could not have been successfully set up by a duly recognized consul, *representative of his sovereign in commercial matters*, in the ordinary course of his official duties, and there seems no adequate reason to presume that the master of the *Gul Djemal* had any greater authority in respect thereto. Although an officer of the Turkish Navy, he was performing no naval or military duty, and was serving upon a vessel *not functioning in naval or military capacity but engaged in commerce* . . . . He was not shown to have any authority to represent his sovereign other than can be inferred from his position as master . . . ." (Emphasis added.) 264 U. S., at 95.

had the authority to commit an act of state, but the difference is unimportant. In both cases, a party claimed to have had the authority to exercise sovereign power. In both, the only authority shown is commercial authority.

We thus disagree with the Court of Appeals that the mere refusal of the interventors to repay funds followed by a failure to prove that interventors "were not acting within the scope of their authority as agents of the Cuban government" satisfied respondents' burden of establishing their act of state defense. *Menendez* v. *Saks & Co.*, 485 F. 2d, at 1371. Nor do we consider *Underhill* v. *Hernandez*, 168 U. S. 250 (1897), heavily relied upon by the Court of Appeals, to require a contrary conclusion.[10] In that case and in *Oetjen* v. *Central Leather Co.*, 246 U. S. 297 (1918), and *Ricaud* v. *American Metal Co.*, 246 U. S. 304 (1918), it was apparently concluded that the facts were sufficient to demonstrate that the conduct in question was the public act of those with authority to exercise sovereign powers and was entitled to respect in our courts. We draw no such conclusion from the facts of the case before us now. As the District Court found, the only evidence of an act of state other than the act of nonpayment by interventors was "a statement by counsel for the interventors, during trial, that the Cuban Government and the interventors denied liability and had refused to make repayment." *Menendez* v. *Faber, Coe & Gregg, Inc.*, 345 F. Supp., at 545. But this merely restated re-

[10] There the commander of a successful revolution, in control of the city of Bolivar, refused a passport to Underhill. Upon suit by Underhill for his detention, this Court refused to inquire into the propriety of the detention because "[t]he acts complained of were the acts of a military commander representing the authority of the revolutionary party as government, which afterwards succeeded and was recognized by the United States." 168 U. S., at 254.

spondents' original legal position and adds little, if anything, to the proof of an act of state. No statute, decree, order, or resolution of the Cuban Government itself was offered in evidence indicating that Cuba had repudiated its obligations in general or any class thereof or that it had as a sovereign matter determined to confiscate the amounts due three foreign importers.

## III

If we assume with the Court of Appeals that the Cuban Government itself had purported to exercise sovereign power to confiscate the mistaken payments belonging to three foreign creditors and to repudiate interventors' adjudicated obligation to return those funds, we are nevertheless persuaded by the arguments of petitioner and by those of the United States that the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities. Our cases have not yet gone so far, and we decline to expand their reach to the extent necessary to affirm the Court of Appeals.

Distinguishing between the public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other is not a novel approach. As the Court stated through Mr. Chief Justice Marshall long ago in *Bank of the United States* v. *Planters' Bank of Georgia,* 9 Wheat. 904, 907 (1824):

> "It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with

whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted."

Cf. *Sloan Shipyards* v. *United States Fleet Corp.*, 258 U. S. 549, 567–568 (1922). In this same tradition, *South Carolina* v. *United States*, 199 U. S. 437 (1905), drew a line for purposes of tax immunity between the historically recognized governmental functions of a State and businesses engaged in by a State of the kind which theretofore had been pursued by private enterprise. Similarly, in *Ohio* v. *Helvering*, 292 U. S. 360, 369 (1934), the Court said: "If a state chooses to go into the business of buying and selling commodities, its right to do so may be conceded so far as the Federal Constitution is concerned; but the exercise of the right is not the performance of a governmental function . . . . When a state enters the market place seeking customers it divests itself of its *quasi* sovereignty *pro tanto,* and takes on the character of a trader . . . ." It is thus a familiar concept that "there is a constitutional line between the State as government and the State as trader . . . ." *New York* v. *United States*, 326 U. S. 572, 579 (1946). See also *Parden* v. *Terminal R. Co.,* 377 U. S. 184, 189–190 (1964); *California* v. *Taylor,* 353 U. S. 553, 564 (1957); *United States* v. *California,* 297 U. S. 175, 183 (1936).

It is the position of the United States, stated in an *amicus* brief filed by the Solicitor General, that such a line should be drawn in defining the outer limits of the act of state concept and that repudiations by a foreign sovereign of its commercial debts should not be considered to be acts of state beyond legal question in our courts. Attached to the brief of the United States and to this opinion as Appendix 1 is the letter of November 26, 1975, in which the Department of State, speaking through its Legal Adviser agrees with the brief filed by the Solicitor General and, more specifically, declares that

"we do not believe that the *Dunhill* case raises an act of state question because the case involves an act which is commercial,[11] and not public, in nature." [12]

The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations. *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S., at 427–428, 431–433. But based on the presently expressed views of those who conduct our relations with foreign countries, we are in no sense compelled to recognize as

[11] The dissent, assuming that the Republic of Cuba purported to exercise sovereign powers in refusing to return Dunhill's money, asserts that there is no distinction between the refusal to honor its obligation to return Dunhill's money and the original expropriation of the cigar businesses; and that the case therefore does not involve a purely commercial act. The dissent is wrong. Cuba's debt to Dunhill arose out of the *conduct* by Cuba's agents of a commercial business for profit. The same may not be said of conventional expropriations of foreign assets located *ab initio* inside a country's territorial borders. Dunhill was continuing to buy cigars from the interventors after intervention and Dunhill knew when the payments were made that the interventors would receive them. *Menendez* v. *Saks & Co.,* 485 F. 2d 1355, 1367–1368 (CA2 1973). The debt would never have arisen if Cuba's agents had not gone into the cigar business and sold to Dunhill. This case is therefore no different from any case in which a buyer overpays for goods sold by a commercial business operated by a foreign government—a commonplace event in international commerce.

[12] The letter also takes the position that sovereign immunity, as such, does not prevent entry of an affirmative judgment on a counterclaim arising out of the same "transaction or occurrence that is the subject matter of the claim of the foreign state," and inferentially that the act of state doctrine is likewise unavailable as a method of avoiding such an affirmative judgment. In light of our conclusion that repudiation by a sovereign of a commercial debt is not an act of state, we do not reach the State Department's alternative position. The letter also takes the position that the overruling of *Sabbatino,* so that acts of state would hereafter be subject

an act of state the purely commercial conduct of foreign governments in order to avoid embarrassing conflicts with the Executive Branch. On the contrary, for the reasons to which we now turn, we fear that embarrassment and conflict would more likely ensue if we were to require that the repudiation of a foreign government's debts arising from its operation of a purely commercial business be recognized as an act of state and immunized from question in our courts.

Although it had other views in years gone by, in 1952, as evidenced by Appendix 2 (the Tate letter) attached to this opinion, the United States abandoned the absolute theory of sovereign immunity and embraced the restrictive view under which immunity in our courts should be granted only with respect to causes of action arising out of a foreign state's public or governmental actions and not with respect to those arising out of its commercial or proprietary actions. This has been the official policy of our Government since that time as the attached letter of November 26, 1975, confirms:

> "Moreover, since 1952, the Department of State has adhered to the position that the commercial and private activities of foreign states do not give rise to sovereign immunity. Implicit in this position is a determination that adjudications of commercial liability against foreign states do not impede the conduct of foreign relations, and that such adjudications are consistent with international law on sovereign immunity."

Repudiation of a commercial debt cannot, consistent with this restrictive approach to sovereign immunity, be treated as an act of state; for if it were, foreign govern-

---

to adjudication in American courts under international law, would not result in embarrassment to the conduct of United States foreign policy. We need not resolve this issue either.

ments, by merely repudiating the debt before or after its adjudication, would enjoy an immunity which our Government would not extend them under prevailing sovereign immunity principles in this country. This would undermine the policy supporting the restrictive view of immunity, which is to assure those engaging in commercial transactions with foreign sovereignties that their rights will be determined in the courts whenever possible.

Although at one time this Court ordered sovereign immunity extended to a commercial vessel of a foreign country absent a suggestion of immunity from the Executive Branch and although the policy of the United States with respect to its own merchant ships was then otherwise, *Berizzi Bros. Co.* v. *S. S. Pesaro,* 271 U. S. 562 (1926), the authority of that case has been severely diminished by later cases such as *Ex parte Peru,* 318 U. S. 578 (1943), and *Mexico* v. *Hoffman,* 324 U. S. 30 (1945). In the latter case the Court unanimously denied immunity to a commercial ship owned but not possessed by the Mexican Government. The decision rested on the fact that the Mexican Government was not in possession, but the Court declared, *id.,* at 35–36:

> "Every judicial action exercising or relinquishing jurisdiction over the vessel of a foreign government has its effect upon our relations with that government. Hence it is a guiding principle in determining whether a court should exercise or surrender its jurisdiction in such cases, that the courts should not so act as to embarrass the executive arm in its conduct of foreign affairs. 'In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.' *United States* v. *Lee, supra,* 209; *Ex parte Peru, supra,* 588.

> "It is therefore not for the courts to deny an

immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize. The judicial seizure of the property of a friendly state may be regarded as such an affront to its dignity and may so affect our relations with it, that it is an accepted rule of substantive law governing the exercise of the jurisdiction of the courts that they accept and follow the executive determination that the vessel shall be treated as immune. *Ex parte Peru, supra,* 588. But recognition by the courts of an immunity upon principles which the political department of government has not sanctioned may be equally embarrassing to it in securing the protection of our national interests and their recognition by other nations." (Footnote omitted.)

In a footnote the Court expressly questioned the *Berizzi Bros.* holding,[13] and two concurring Justices asserted that the Court had effectively overruled that case.[14]

---

[13] "This salutary principle was not followed in *Berizzi Bros. Co. v. The Pesaro,* 271 U. S. 562, where the court allowed the immunity, for the first time, to a merchant vessel owned by a foreign government and in its possession and service, although the State Department had declined to recognize the immunity. The propriety of thus extending the immunity where the political branch of the government had refused to act was not considered.

"Since the vessel here, although owned by the Mexican Government, was not in its possession and service, we have no occasion to consider the questions presented in the *Berizzi* case. It is enough that we find no persuasive ground for allowing the immunity in this case, an important reason being that the State Department has declined to recognize it." 324 U. S., at 35 n. 1.

[14] Mr. Justice Frankfurter, joined by Mr. Justice Black, said:

"The fact of the matter is that the result in *Berizzi Bros. Co. v. The Pesaro, supra,* was reached without submission by the Department of State of its relevant policies in the conduct of our foreign relations and largely on the basis of considerations which have steadily lost whatever validity they may then have had. Compare

Since that time, as we have said, the United States has adopted and adhered to the policy declining to extend sovereign immunity to the commercial dealings of

---

the overruling of *The Thomas Jefferson,* 10 Wheat. 428 (1825), by *The Genesee Chief,* 12 How. 443 (185[2]). The views of our State Department against immunity for commercial ships owned by foreign governments have been strongly supported by international conferences, some held after the decision in the *Pesaro* case. See Lord Maugham in *Compania Naviera Vascongado* v. *The Cristina* [1938] A. C. 485, 521–523. But the real change has been the enormous growth, particularly in recent years, of 'ordinary merchandising' activity by governments. See *The Western Maid,* 257 U. S. 419, 432. Lord Maugham in the *Cristina* thus put the matter:

" 'Half a century ago foreign Governments very seldom embarked in trade with ordinary ships, though they not infrequently owned vessels destined for public uses, and in particular hospital vessels, supply ships and surveying or exploring vessels. These were doubtless very strong reasons for extending the privilege long possessed by ships of war to public ships of the nature mentioned; but there has been a very large development of State-owned commercial ships since the Great War, and the question whether the immunity should continue to be given to ordinary trading ships has become acute. Is it consistent with sovereign dignity to acquire a tramp steamer and to compete with ordinary shippers and ship-owners in the markets of the world? Doing so, is it consistent to set up the immunity of a sovereign if, owing to the want of skill of captain and crew, serious damage is caused to the ship of another country? Is it also consistent to refuse to permit proceedings to enforce a right of salvage in respect of services rendered, perhaps at great risk, by the vessel of another country?' [1938] A. C. 485, 521–522.

. . . . .

"It is my view, in short, that courts should not disclaim jurisdiction which otherwise belongs to them in relation to vessels owned by foreign governments however operated except when 'the department of the government charged with the conduct of our foreign relations,' or of course Congress, explicitly asserts that the proper conduct of these relations calls for judicial abstention. Thereby responsibility for the conduct of our foreign relations will be placed where power lies. And unless constrained by the established policy of our State Department, courts will best discharge their responsi-

foreign governments. It has based that policy in part on the fact that this approach has been accepted by a large and increasing number of foreign states in the international community;[15] in part on the fact that the United States had already adopted a policy of consenting to be sued in foreign courts in connection with suits against its merchant vessels; and in part because the enormous increase in the extent to which foreign sovereigns had become involved in international trade made essential "a practice which will enable persons doing business with them to have their rights determined in the courts." Appendix 2 to this opinion, *infra*, at 714.

In the last 20 years, lower courts have concluded, in

---

bility by enforcement of the regular judicial processes." *Id.*, at 40–42.

[15] Austria: *Collision with Foreign Government-Owned Motor Car (Austria) Case*, [1961] 40 Int'l L. Rep. 73 (Sup. Ct.). Belgium: *"Socobel"* v. *Greek State*, [1951] 18 Int'l L. Rep. 3 (Trib. Civ. Brussels). Canada: *Penthouse Studios, Inc.* v. *Republic of Venezuela*, [1970] 8 D. L. R. 3d 686 (Quebec Ct. App., 1969). England: *Thai-Europe Tapioca Service* v. *Government of Pakistan*, [1975] 1 W. L. R. 1485 (C. A.). *Philippine Admiral* v. *Wallem Shipping*, [1976] 1 All E. R. 78 (P. C.). Egypt: *Federated People's Republic of Yugoslavia* v. *Kafr El-Zayat Cotton Co.*, [1951] 18 Int'l L. Rep. 225 (Civ. Trib. Alexandria) France: *Administration des Chemins de Fer Iraniens* v. *Société Levant Express Transport*, 73 Revue Générale de Droit International Public 883 (Sup. Ct. 1969). Germany: *Claim against the Empire of Iran Case*, [1963] 45 Int'l L. Rep. 57 (Fed. Const. Ct.). Greece: *Papaevangelou* v. *United States Government* (Athens First Instance Ct., Apr. 23, 1960). Hong Kong: *Midland Investment Co., Ltd.* v. *Bank of Communications*, [1956] 40 H. K. L. Rep. 42, 23 Int'l L. Rep. 234 (S. Ct.). Italy: *United States* v. *Soc. I. R. S. A.*, 86 Il Foro Italiano Part I, 1405 (Sup. Ct., en banc, Mar. 13, 1963). Pakistan: *Gammon-Layton* v. *Secretary of State, U. S. A.*, P. L. D. 1965 (W. P.) Karachi 425. Philippines: *Carried Lumber Co.* v. *United States of America* (Ct. App. Manila, Sept. 24, 1974). Yugoslavia: *Zarko* v. *Office of International Trade Fairs, U. S. Department of Commerce* (Dist. Ct. Zagreb, June 10, 1966).

light of this Court's decisions in *Ex parte Peru, supra,* and *Mexico* v. *Hoffman, supra,* and from the Tate letter and the changed international environment, that *Berizzi Bros. Co.* v. *S. S. Pesaro, supra,* no longer correctly states the law; and they have declined to extend sovereign immunity to foreign sovereigns in cases arising out of purely commercial transactions. *Victory Transport, Inc.* v. *Comisaria General,* 336 F. 2d 354 (CA2 1964), cert. denied, 381 U. S. 934 (1965); *Petrol Shipping Corp.* v. *Kingdom of Greece,* 360 F. 2d 103 (CA2), cert. denied, 385 U. S. 931 (1966); *Premier S. S. Co.* v. *Embassy of Algeria,* 336 F. Supp. 507 (SDNY 1971); *Ocean Transport Co.* v. *Government of Republic of Ivory Coast,* 269 F. Supp. 703 (ED La. 1967); *ADM Milling Co.* v. *Republic of Bolivia,* Civ. Action No. 75–946 (DC Aug. 8, 1975); *Et Ve Balik Kurumu* v. *B. N. S. Int'l Sales Corp.,* 25 Misc. 2d 299, 304 N. Y. S. 2d 971 (1960); *Harris & Co. Advtg., Inc.* v. *Republic of Cuba,* 127 So. 2d 687 (Fla. Ct. App. 1961). Indeed, it is fair to say that the "restrictive theory" of sovereign immunity appears to be generally accepted as the prevailing law in this country. ALI, Restatement (Second), Foreign Relations Law of the United States, § 69 (1965).

Participation by foreign sovereigns in the international commercial market has increased substantially in recent years. Cf. International Economic Report of the President 56 (1975). The potential injury to private businessmen—and ultimately to international trade itself—from a system in which some of the participants in the international market are not subject to the rule of law has therefore increased correspondingly. As noted above, courts of other countries have also recently adopted the restrictive theory of sovereign immunity. Of equal importance is the fact that subjecting foreign governments to the rule of law in their commercial dealings presents a much smaller risk of affronting their sovereignty than

would an attempt to pass on the legality of their governmental acts.[16] In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, they exercise only those powers that can also be exercised by private citizens. Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on "national nerves." Moreover, as this Court has noted:

> "[T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S., at 428.

See also *id.,* at 430 n. 34. There may be little codification or consensus as to the rules of international law concerning exercises of *governmental* powers, including military powers and expropriations, within a sovereign state's borders affecting the property or persons of aliens. However, more discernible rules of international law have emerged with regard to the commercial dealings of private parties in the international market.[17] The restric-

---

[16] In *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 428 (1964), the Court noted in the context of the act of state doctrine: "It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."

[17] Schmitthoff, The Unification or Harmonisation of Law by Means of Standard Contracts and General Conditions, 17 Int'l & Comp. L. Q. 551, 563–564 (1968). See also A. Lowenfeld, International Private Trade 1–2 (1975); Gal, The Commercial Law of Nations

tive approach to sovereign immunity suggests that these established rules should be applied to the commercial transactions of sovereign states.

Of course, sovereign immunity has not been pleaded in this case; but it is beyond cavil that part of the foreign relations law recognized by the United States is that the commercial obligations of a foreign government may be adjudicated in those courts otherwise having jurisdiction to enter such judgments. Nothing in our national policy calls on us to recognize as an act of state a repudiation by Cuba of an obligation adjudicated in our courts and arising out of the operation of a commercial business by one of its instrumentalities. For all the reasons which led the Executive Branch to adopt the restrictive theory of sovereign immunity, we hold that the mere assertion of sovereignty as a defense to a claim arising out of purely commercial acts by a foreign sovereign is no more effective if given the label "Act of State" than if it is given the label "sovereign immunity." [18]

---

and the Law of International Trade, 6 Corn. Int'l L. J. 55, 64 (1972); H. Trammer, The Law of Foreign Trade in the Legal Systems of the Countries of Planned Economy, in The Sources of the Law of International Trade 41 (Schmitthoff ed. 1964) (hereinafter Schmitthoff); V. Knapp, The Function, Organization and Activities of Foreign Trade Corporations in the European Socialist Countries, Schmitthoff 52; A. Goldstajn, International Conventions and Standard Contracts as Means of Escaping from the Application of Municipal Law—I, Schmitthoff 103; T. Ionasco & I. Nestor, The Limits of Party Autonomy—I, Schmitthoff 167; and Schmitthoff, Introduction, Schmitthoff ix.

[18] The dissent states that the doctrines of sovereign immunity and act of state are distinct—the former conferring on a sovereign "exemption from suit by virtue of its status" and the latter "merely [telling] a court what law to apply to a case." *Post*, at 725–726, 726. It may be true that the one doctrine has been described in jurisdictional terms and the other in choice-of-law terms; and it may be that the doctrines point to different results in certain cases. It cannot be gainsaid, however, that the proper application of each

In describing the act of state doctrine in the past we have said that it "precludes the courts of this country from inquiring into the validity of the *public* acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba* v. *Sabbatino, supra,* at 401 (emphasis added), and that it applies to "acts done within their own States, in the exercise of *governmental* authority." *Underhill* v. *Hernandez,* 168 U. S., at 252 (emphasis added). We decline to extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely commercial operations. Because the act relied on by respondents in this case was an act arising out of the conduct by Cuba's agents in the operation of cigar businesses for profit, the act was not an act of state.

*Reversed.*

## APPENDIX 1 TO OPINION OF THE COURT

THE LEGAL ADVISER,
DEPARTMENT OF STATE,
*Washington, November 26, 1975.*

DEAR MR. SOLICITOR GENERAL:

In the case of *Alfred Dunhill of London, Inc.* v. *The*

---

involves a balancing of the injury to our foreign policy, the conduct of which is committed primarily to the Executive Branch, through judicial affronts to sovereign powers, compare *Mexico* v. *Hoffman,* 324 U. S., at 35–36 (sovereign immunity), with *Banco Nacional de Cuba* v. *Sabbatino, supra,* at 423, 427–428 (act of state), against the injury to the private party, who is denied justice through judicial deference to a raw assertion of sovereignty, and a consequent injury to international trade. The State Department has concluded that in the commercial area the need for merchants "to have their rights determined in courts" outweighs any injury to foreign policy. This conclusion was reached in the context of the jurisdictional problem of sovereign immunity. We reach the same one in the choice-of-law context of the act of state doctrine.

*Republic of Cuba,* which is before the Supreme Court on petition for a writ of certiorari, No. 73–1288, the Court has requested the parties to discuss whether its holding in *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, should be reconsidered.

The Department of State believes that the question of whether the *Sabbatino* case should be reconsidered involves matters of importance to the foreign policy interests of the United States and requests that its views be conveyed to the Supreme Court.

The views expressed herein are in addition to the arguments presented in the brief amicus curiae which the United States is filing in the *Dunhill* case. As urged in that brief, we do not believe that the *Dunhill* case raises an act of state question because the case involves an act which is commercial, and not public, in nature. Moreover, since 1952, the Department of State has adhered to the position that the commercial and private activities of foreign states do not give rise to sovereign immunity. Implicit in this position is a determination that adjudications of commercial liability against foreign states do not impede the conduct of foreign relations, and that such adjudications are consistent with international law on sovereign immunity.

In the event, however, that the Court reaches the question whether the *Sabbatino* holding should be reconsidered, we believe that the following considerations should be called to the Court's attention:

Since *Sabbatino* was decided in 1964, the Department of State has on two occasions expressed to courts in the United States its views concerning act of state adjudications. First, in the *Sabbatino* case itself, on remand, the Executive Branch declined to make a determination under the Hickenlooper Amendment, 22 U. S. C. 2370 (e)(2), "that application of the act of state doctrine is required in this case by the foreign policy

interests of the United States." *Banco Nacional de Cuba* v. *Farr,* 272 F. Supp. 836, 837 (S. D. N. Y.), aff'd, 383 F. 2d 166 (C. A. 2), certiorari denied, 390 U. S. 956. Having taken note of the Executive Branch's position, the district court in *Farr* applied the Hickenlooper Amendment and held that a Cuban decree of confiscation violated customary international law. 272 F. Supp., at 838.

Second, in *First National City Bank* v. *Banco Nacional de Cuba,* 406 U. S. 759, the Department of State informed the Supreme Court that general foreign relations considerations did not require application of the act of state doctrine to bar adjudication of a counterclaim when the foreign state's claim arises from a relationship between the parties existing when the act of state occurred, and when the amount of relief to be granted is limited to the amount of the foreign state's claim.[1] Relying on the precedent of *Bernstein* v. *N. V. Nederlandsche Amerikaanshe, Etc.,* 210 F. 2d 375 (C. A. 2), where the Department had advised that the act of state doctrine need not apply to a class of cases involving Nazi confiscations, the Department in *First National City Bank* concluded that the act of state doctrine need not be applied "in this or like cases."

---

[1] Since *First National City Bank* was decided, the Department of State has taken the position in the sovereign immunity area that even where a counterclaim exceeds the foreign state's claim, the courts may adjudicate the counterclaim if it arises from the same "transaction or occurrence that is the subject matter of the claim of the foreign state." S. 566, 93d Cong., 1st Sess., § 1607 (1); see, ALI, Restatement, Foreign Relations Law of the United States, Second, § 70 (2) (b). In our view, the adjudication of counterclaims against a foreign state, arising from the same transaction, occurrence or subject matter as the claim of the foreign state, does not pose foreign relations difficulties.

Significantly, the *Farr, Bernstein* and *First National City Bank* cases each involved an Executive Branch determination which opened the way for U. S. courts to review an act of state on the merits under international law. In each of these cases, the claim or counterclaim in question alleged that an act of state violated customary international law. Thus, at least on a case-by-case basis, the trend in Executive Branch pronouncements has been that foreign relations considerations do not require application of the act of state doctrine to bar adjudications under international law.

This trend is mirrored in other countries. Apart from the cases cited by Mr. Justice White in *Sabbatino*, 376 U. S., at 440 n. 1, there have been several recent decisions where foreign courts have reviewed state acts under international law.[2] English law, from

---

[2] See, *e. g.*, *In The Matter of Minera El Teniente, S. A.*, 12 Int'l Legal Materials 251 (Superior Ct. Hamburg, 1973) (a foreign state's act of expropriation that violates international law will not be recognized by German courts if the subject matter of the litigation has a substantial contact with Germany); *Braden Copper Co.* v. *Le Groupement d'Importation des Métaux*, 12 Int'l Legal Materials 187 (Ct. of Extended Jurisdiction Paris, 1972) (rejecting sovereign immunity of a state trading company that marketed expropriated copper); *Compagnie Française de Crédit et de Banque* v. *Consorts Atard*, Clunet, J. du Droit Int'l, 98 (1971), p. 86 (France: Cour d'Appel Amiens, 1970) (foreign expropriation decrees will not be recognized in France absent the payment of prompt, adequate and effective compensation); *Crédit Foncier d'Algerie et de Tunisie* v. *Narbonne*, Clunet, J. du Droit Int'l 96 (1969), p. 912 (France: Cou[r] de Cassation, 1969) (acts of expropriation not recognized in France unless equitable compensation is first determined); *Obe[r]ster Gerichtshof* (Austrian Supreme Court), decision of 22 December 1965, Osterr. Juristenzeitung 21 (1966), p. 204, Clunet, J. du Droit Int'l, 94 (1967), p. 941 (an expropriation without compensation violates international law, but no recovery against purchasers of expropriated property); *N. V. Assurantie Maatschappij*

which our act of state doctrine derives, does not require British courts to abstain from reviewing state acts under international law.[3]  As far as can be determined, this exercise of the judicial function in foreign jurisdictions has not caused serious foreign relations consequences for the countries concerned.

The present case is similar to *Bernstein*, *Farr* and *First National City Bank*.  This Department is of the opinion that there would be no embarrassment to the conduct of foreign policy if the Court should decide in this case to adjudicate the legality of any act of state found to have taken place and to make such adjudication in accordance with any principle of international law found to be relevant.

In general this Department's experience provides little support for a presumption that adjudication of acts of foreign states in accordance with relevant principles of international law would embarrass the conduct of foreign policy.  Thus, it is our view that if the Court should decide to overrule the holding in *Sabbatino* so that acts of state would thereafter be subject to adjudication in American courts under international law, we would not anticipate embarrass-

---

*de Nederlanden van 1845* v. *P. T. Escomptobank*, 33 Int'l L. Rep. 30 (D. Ct. The Hague, 1962) (rejecting act of state defense where there is a violation of international law).

[3] *Banco de Vizcaya* v. *Don Alfonso de Borbon y Austria*, [1935] 1 K. B. 140, 50 T. L. R. 284; *Re Helbert Wagg & Co. Ltd.*, [1956] Ch. 323, 346; 1 Lauterpacht, *Oppenheim's International Law*, 267–268 (8th ed. 1955).  See also *Republic of Peru* v. *Peruvian Guano Co.*, [1887] 36 Ch. D. 489 and *Republic of Peru* v. *Dreyfus Brothers & Co.* [1888] 38 Ch. D. 348, where British courts, under international law, refused to give effect to Peruvian laws annulling acts of the preceding Peruvian government; cf. *Buttes Gas and Oil Co.* v. *Hammer* [1975] 2 W. L. R. 425, at 434–435.

ment to the conduct of the foreign policy of the United States.

Sincerely,

MONROE LEIGH.

## APPENDIX 2 TO OPINION OF THE COURT*

*May 19, 1952.*

MY DEAR MR. ATTORNEY GENERAL:

The Department of State has for some time had under consideration the question whether the practice of the Government in granting immunity from suit to foreign governments made parties defendant in the courts of the United States without their consent should not be changed. The Department has now reached the conclusion that such immunity should no longer be granted in certain types of cases. In view of the obvious interest of your Department in this matter I should like to point out briefly some of the facts which influenced the Department's decision.

A study of the law of sovereign immunity reveals the existence of two conflicting concepts of sovereign immunity, each widely held and firmly established. According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign. According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*). There is agreement by proponents of both theories, supported by practice, that sovereign immunity should not be claimed or granted in actions with respect to real property (diplomatic and perhaps consular property excepted) or with respect to the disposition of the

---

*26 Dept. State Bull. 984–985 (1952).

property of a deceased person even though a foreign sovereign is the beneficiary.

The classical or virtually absolute theory of sovereign immunity has generally been followed by the courts of the United States, the British Commonwealth, Czechoslovakia, Estonia, and probably Poland.

The decisions of the courts of Brazil, Chile, China, Hungary, Japan, Luxembourg, Norway, and Portugal may be deemed to support the classical theory of immunity if one or at most two old decisions anterior to the development of the restrictive theory may be considered sufficient on which to base a conclusion.

The position of the Netherlands, Sweden, and Argentina is less clear since although immunity has been granted in recent cases coming before the courts of those countries, the facts were such that immunity would have been granted under either the absolute or restrictive theory. However, constant references by the courts of these three countries to the distinction between public and private acts of the state, even though the distinction was not involved in the result of the case, may indicate an intention to leave the way open for a possible application of the restrictive theory of immunity if and when the occasion presents itself.

A trend to the restrictive theory is already evident in the Netherlands where the lower courts have started to apply that theory following a Supreme Court decision to the effect that immunity would have been applicable in the case under consideration under either theory.

The German courts, after a period of hesitation at the end of the nineteenth century have held to the classical theory, but it should be noted that the refusal of the Supreme Court in 1921 to yield to pressure by the lower courts for the newer theory was based on the view that that theory had not yet developed sufficiently to justify a change. In view of the growth of the restrictive

theory since that time the German courts might take a different view today.

The newer or restrictive theory of sovereign immunity has always been supported by the courts of Belgium and Italy. It was adopted in turn by the courts of Egypt and of Switzerland. In addition, the courts of France, Austria, and Greece, which were traditionally supporters of the classical theory, reversed their position in the 20's to embrace the restrictive theory. Rumania, Peru, and possibly Denmark also appear to follow this theory.

Furthermore, it should be observed that in most of the countries still following the classical theory there is a school of influential writers favoring the restrictive theory and the views of writers, at least in civil law countries, are a major factor in the development of the law. Moreover, the leanings of the lower courts in civil law countries are more significant in shaping the law than they are in common law countries where the rule of precedent prevails and the trend in these lower courts is to the restrictive theory.

Of related interest to this question is the fact that ten of the thirteen countries which have been classified above as supporters of the classical theory have ratified the Brussels Convention of 1926 under which immunity for government owned merchant vessels is waived. In addition the United States, which is not a party to the Convention, some years ago announced and has since followed, a policy of not claiming immunity for its public owned or operated merchant vessels. Keeping in mind the importance played by cases involving public vessels in the field of sovereign immunity, it is thus noteworthy that these ten countries (Brazil, Chile, Estonia, Germany, Hungary, Netherlands, Norway, Poland, Portugal, Sweden) and the United States have already relinquished by treaty or in practice an important part of the immunity which they claim under the classical theory.

It is thus evident that with the possible exception of the United Kingdom little support has been found except on the part of the Soviet Union and its satellites for continued full acceptance of the absolute theory of sovereign immunity. There are evidences that British authorities are aware of its deficiencies and ready for a change. The reasons which obviously motivate state trading countries in adhering to the theory with perhaps increasing rigidity are most persuasive that the United States should change its policy. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is most inconsistent with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

It is realized that a shift in policy by the executive cannot control the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so. There have been indications that at least some Justices of the Supreme Court feel that in this matter courts should follow the branch of the Government charged with responsibility for the conduct of foreign relations.

In order that your Department, which is charged with representing the interests of the Government before the courts, may be adequately informed it will be the Department's practice to advise you of all requests by foreign

governments for the grant of immunity from suit and of the Department's action thereon.

Sincerely yours,

For the Secretary of State:

JACK B. TATE
*Acting Legal Adviser*

MR. JUSTICE POWELL, concurring.

I join the opinion of the Court. Since the line between commercial and political acts of a foreign state often will be difficult to delineate, I write to reaffirm my view that even in cases deemed to involve purely political acts, it is the duty of the judiciary to decide for itself whether deference to the political branches of Government requires abstention. As I stated in *First Nat. City Bank* v. *Banco Nacional de Cuba,* 406 U. S. 759, 775–776 (1972) (concurring in judgment):

> "Unless it appears that an exercise of jurisdiction would interfere with delicate foreign relations conducted by the political branches, I conclude that federal courts have an obligation to hear cases such as this."

Just as I saw no circumstances requiring judicial abstention in that case, I see none here. Nor can I foresee any in cases involving only the commercial acts of a foreign state.

MR. JUSTICE STEVENS, concurring.

For reasons stated in Parts I and II of the Court's opinion, I agree that the act of state doctrine does not bar the entry of the judgment in favor of Dunhill.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE BLACKMUN join, dissenting.

The act of state doctrine commits the courts of this country not to sit in judgment on the acts of a foreign

government performed within its own territory.[1]   Under any realistic view of the facts of this case, the intervenors' retention of and refusal to return funds paid to them by Dunhill constitute an act of state, and no affirmative recovery by Dunhill can rest on the invalidity of that conduct.   The Court of Appeals so concluded, and I would affirm its judgment.

I

As of September 15, 1960, when the Cuban Government "intervened," or nationalized, five Cuban-owned cigar manufacturers, petitioner Dunhill had received some $148,600 worth of cigars for which it had not yet paid.   In the period between intervention and February 1961, Dunhill took delivery of an additional $93,000 worth of shipments.   Both the District Court and the Court of Appeals concluded that the intervention was to be given full legal effect with respect to the property of Cuban nationals located in Cuba, and that the intervenors were therefore entitled to payment for postintervention shipments.   *F. Palicio y Compania, S. A.* v. *Brush,* 256 F. Supp. 481, 486–490 (SDNY 1966), aff'd, 375 F. 2d 1011 (CA2), cert. denied *sub nom. Brush* v. *Republic of Cuba,* 389 U. S. 830 (1967).   It is quite clear that that result was correct, and that it would have been no different had the intervened firms been owned by United States citizens.   *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964).

---

[1] The classic American formulation of the doctrine, see *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 416 (1964), appears in *Underhill* v. *Hernandez,* 168 U. S. 250, 252 (1897):

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.   Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

Since the date of intervention, the interventors have taken the position that they were also entitled to receive the amounts due to the intervened firms for preintervention shipments—in the case of Dunhill, $148,600. And throughout this litigation, respondents, the interventors [2] and the Republic of Cuba, have insisted that the act of state doctrine requires our courts to give full legal effect to the intervention decree insofar as it purported to nationalize the accounts receivable of the intervened firms. Both the District Court and the Court of Appeals held, however, that the accounts receivable involved here had their situs in New York, that the act of state doctrine did not apply, and that the attempted confiscation was ineffective. *Menendez* v. *Faber, Coe & Gregg, Inc.,* 345 F. Supp. 527, 536–540 (SDNY 1972); *Menendez* v. *Saks & Co.,* 485 F. 2d 1355, 1364–1365 (CA2 1973). In a separate petition for certiorari, which the Court today denies,[3] and in the course of its presentation in this case, respondents have pursued their contention that the initial intervention should be recognized as having reached the preintervention accounts receivable. But that is not the respondents' sole contention, and it is not necessary for us to consider it here. For, as the Court of Appeals recognized, the act of state question took on a wholly different light when Dunhill paid the amount due for preintervention shipments to the interventors in Cuba.[4]

---

[2] Actually only one of the interventors is a party in this Court; he has apparently been designated as the single interventor for the five intervened tobacco companies. For the sake of convenience, I shall continue to refer to "the interventors."

[3] *Republic of Cuba* v. *Saks & Co.,* No. 73–1287, *post,* p. 991.

[4] Payment was made to collecting banks that had previously acted as agents for the former owners. The District Court expressly found that "the importers [including Dunhill] well knew that, following intervention, the collecting banks were acting as agents for the interventors and not the [former] owners, and also

The Court of Appeals held that Dunhill's claim for return of the monies paid to the interventors for pre-intervention shipments sounds in quasi-contract; it arises, the court observed, not from Dunhill's contractual obligation to the owners, which is situated in New York, but from the interventors' receipt, appropriation, and refusal to return the funds, all of which have occurred apart from the contract and in Cuba. If the interventors' course of conduct is itself an act of state, therefore, there can be no doubt that the act of state doctrine applies.

The interventors have not taken any discrete, overt action for which to claim the status of an act of state. Rather, they have received and long retained the money paid to them for preintervention shipments, and they have ignored Dunhill's demands for its return. The Court declines to view this course of conduct as reflecting an exercise of sovereign power to retain the funds at issue after they arrived in Cuba, explaining in part:

> "No statute, decree, order, or resolution of the Cuban Government itself was offered in evidence indicating that Cuba had repudiated her obligations in general or any class thereof or that she had as a sovereign matter determined to confiscate the amounts due [Dunhill and the other] foreign importers." *Ante,* at 695.

I do not understand the Court to suggest, however, that the act of state doctrine can be triggered only by a "statute, decree, order, or resolution" of a foreign government, or that the presence of an act of state can only be demonstrated by some affirmative action by the foreign sovereign. While it is true that an act of state

---

knew that the payments they were making to the collecting banks were ultimately received by the interventors in Cuba." 345 F. Supp., at 542. These findings were sustained by the Court of Appeals. 485 F. 2d, at 1367–1368.

generally takes the form of an executive or legislative
step formalized in a decree or measure, see, e. g., Banco
Nacional de Cuba v. Sabbatino, 376 U. S. 398, 403–405,
n. 7 (1964); Eastern States Petroleum Co. v. Asiatic
Petroleum Corp., 28 F. Supp. 279 (SDNY 1939), that is
only because duly constituted governments generally
act through formal means. When they do not, their
acts are no less the acts of a state, and the doctrine,
being a practical one, is no less applicable. Thus, in
Underhill v. Hernandez, 168 U. S. 250 (1897), where the
plaintiff sought recovery for his detention in Venezuela
by reason of the then revolutionary forces' refusal to
grant him a passport out of Ciudad Bolivar, the Court
held that the act of state doctrine "must necessarily
extend to the agents of governments ruling by para-
mount force as [a] matter of fact." Id., at 252. The
cases of Oetjen v. Central Leather Co., 246 U. S. 297
(1918), and Ricaud v. American Metal Co., 246 U. S.
304 (1918), are further illustrations of the practical
approach the Court has always taken in determining
whether an act of state is present. In each case the
plaintiff claimed title to goods purchased from Mexican
sellers but confiscated by generals of the Constitution-
alist Carranza forces before delivery to the plaintiffs.
The Generals, Villa and Pereyra respectively, had sold the
goods to intermediate purchasers for the furtherance of
the revolution, and the goods thereafter came into the
United States in the possession of the defendant-
assignees. The Court held that the seizures in question
must be viewed as the action, in time of civil war, of a
duly commissioned agent of the prevailing Mexican Gov-
ernment, and could not be subjected to the scrutiny of
another sovereign's courts.

These cases demonstrate not only that an act of state
need not be formalized in any particular manner, but also
that it need not take the form of active, rather than

passive, conduct. Had General Villa come accidentally into possession of the hides sought to be replevied in *Oetjen,* instead of seizing them, and then simply refused the plaintiff's demand for possession, the result could not have been any different. Indeed, so far as the report of the *Underhill* case reveals, the plaintiff, in seeking recovery for his detention, challenged no more than General Hernandez' refusal to do anything when he demanded his passport.

That a foreign sovereign has issued no formal decree and performed no "affirmative" act is not fatal, then, to an act of state claim. If the foreign state has exercised a sovereign power either to act or to refrain from acting, there is an act of state. In a case very similar to this one, the New York Court of Appeals held that the Cuban bank's dishonoring of tax exemption certificates, the redemption of which had been suspended by a decision of the Cuban Currency Stabilization Fund, was an act of state. *French* v. *Banco Nacional de Cuba,* 23 N. Y. 2d 46, 242 N. E. 2d 704 (1968). The act of state, the court wrote, "was the defendant's refusal to perform; the currency regulations, though equally the product of an act of state, were simply the justification for the refusal." [5]

The Court, I take it, does not dispute that a refusal to act constitutes an act of state when shown to reflect the exercise of sovereign power. Rather, the Court finds no exercise of sovereign power to retain the funds at issue after they arrived in Cuba. Refusal to repay, the Court suggests, does not necessarily reflect anything more than the interventors' initial contention, rejected by the Dis-

---

[5] The quoted statement appears in the concurring opinion of Judge Hopkins, 23 N. Y. 2d, at 66, 242 N. E. 2d, at 717, which was joined by the same majority that subscribed to the opinion of Chief Judge Fuld, in which the court held: "[T]he breach of contract, of which the plaintiff complains, resulted from, and, indeed, itself constitutes, an act of state." *Id.,* at 53, 242 N. E. 2d, at 709.

trict Court and the Court of Appeals, that the September 15, 1960, intervention decree operated to seize the accounts receivable of the intervened firms. And the Court is unwilling "to infer from the fact that Cuba seized the assets of the cigar business from Cuban nationals that they must necessarily . . . have made a later discriminatory and confiscatory seizure of money belonging to the United States companies." *Ante*, at 692 n. 8.

As I have already indicated, however, the respondents' position has not been, and need not be, limited to the contention that the September 15 decree operated to seize the preintervention accounts receivable. Counsel for the interventors and the Republic of Cuba stated at trial, in his brief to this Court, and again in his oral argument in this Court:

> "[U]nder the act of state doctrine the Cuban government, in accepting, expropriating, seizing, nationalizing, whatever other words you want, to take this money, has done so pursuant to a regulation, a law, a decree of the government of Cuba, and therefore the courts of this state will not look into the matter nor will the federal court.
>
> "Now, I am not talking about the extraterritorial effect of an act of state. I am talking about a territorial effect, namely, the seizure or the acceptance or the appropriation of this money when it got down to Cuba. We are not now concerned with whether they expropriated debts on September 15th. The question is what happened on October 1st, and October 15th and on November 8th and December 12th, when the money came down. And at that time the Cuban government took this money and under the act of state doctrine it belongs to the Cuban government." Tr. 854–856; Brief for Respond-

ents in Reply to Brief for United States as *Amicus Curiae* 5 n. 3; Tr. of Oral Rearg. 38.

This statement confirms that while Cuba's retention of and refusal to return the funds once they arrived in Cuba was "pursuant to" the September 15 decree, it was without regard to whether that decree would, in the eyes of a United States court, have entitled the interventors to collect the accounts receivable in the first place.[6] And while the Court appears to suggest that Cuba would be more hesitant to seize money belonging to United States companies than it would be to seize property belonging to Cuban nationals, the fact is that in this case Cuba has made known its intent to retain the funds in question even if a United States court declares the funds to have been taken from Dunhill rather than from the former owners. Speaking once again on behalf of his client, the Republic of Cuba, counsel has announced Cuba's "refusal to acquiesce in the quasi-contractual obligation [to Dunhill] sought to be imposed by a foreign court." Brief for Respondents in Reply to Brief for United States as *Amicus Curiae* 5.[7]

---

[6] In another brief filed in this Court, respondents' counsel observed:

"It matters not that the interventor may be wrong in the eyes of the United States court [in claiming that the September 15 decree nationalized the preintervention accounts receivable]. . . . Since the monies taken by the interventor were in Cuba, and he was a representative of the sovereign, it can hardly be denied that his conduct amounted to 'a taking of property within its own territory by a foreign sovereign government.' [*Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S., at 428.]" Brief for Respondents 18.

[7] The Court acknowledges that this statement reflects an alternative contention by respondents that, assuming the ineffectiveness of the September 15 decree in reaching the preintervention accounts receivable and the existence of a quasi-contractual obligation to return the monies at issue to Dunhill, their repudiation of that obli-

The above-quoted statements of counsel are not them-
selves acts of state. But as authoritative representations
of the position of counsel's clients, the interventors and
the Republic of Cuba, with respect to the monies in their
possession, these statements do serve to confirm that the
continued retention of those monies has been undertaken
as an exercise of sovereign power.[8]

gation was an act of state. *Ante*, at 692 n. 8. But the Court em-
phasizes the fact that respondents have not admitted the existence
of an obligation to Dunhill, and concludes that it remains unclear
whether respondents have determined to retain the monies even if
a United States court declares the obligation to exist. The very
fact that respondents are making the alternative argument referred
to herein, however, should remove any doubt as to their intentions.

[8] *Compania Espanola de Navegacion Maritima* v. *The Navemar*,
303 U. S. 68 (1938), is not to the contrary. That was a suit in
admiralty by the alleged owner of a Spanish merchant vessel to
recover possession. The Spanish Ambassador sought leave to inter-
vene as a claimant and produced an "affidavit of the Spanish Acting
Consul General suggesting that when the suit was brought the vessel
was the property of the Republic of Spain, by virtue of a decree of
attachment promulgated by the President of the Republic, appro-
priating the vessel to the public use, and that it was then in the
possession of the Spanish Government." *Id.*, at 70. The District
Court, we held, "was not bound . . . to accept the allegations of the
suggestion as conclusive" on the question of possession, *id.*, at 75,
where there was no proof whatever that the foreign sovereign had
ever held possession and no claim that "the alleged seizure [of the
vessel] by the members of the crew was an act of or in behalf of the
Spanish Government." *Id.*, at 72.

By contrast, in the present case it is settled that the interventors
received the payments for preintervention shipments on behalf of
the Cuban Government, *Menendez* v. *Faber, Coe & Gregg Inc.*, 345
F. Supp., at 532, and any lingering doubt that their retention was by
virtue of a claim of right was dispelled by counsel for Cuba and
the interventors at trial. Had possession been established in *The
Navemar*, and the decree of appropriation been in doubt, the case
would be in point, but in fact the contrary was true and the case
is inapposite.

It was in response to the suggestion that *The Navemar* case con-

## II

MR. JUSTICE WHITE advances a contention, not adopted by the Court, that even if the Cuban Government "had purported to exercise sovereign power to confiscate" the monies at issue, *ante*, at 695, the act of state doctrine is inapplicable because of the "purely commercial" nature of the confiscation. While I am prompted to make several observations on the suggested rationale for a broad "commercial act" exception to the act of state doctrine, ultimately there is no need to consider whether, and under what circumstances, an exception for commercial acts might be appropriate. It will suffice to say that no such exception is appropriate in this case.

## A

I note at the outset that the commercial act exception to the act of state doctrine is supported by the Department of State. In its most recent *Bernstein* letter,[9] the Department has expressed the opinion that the conduct of foreign policy would suffer no embarrassment if the Court declined to apply the act of state doctrine to this case, if it declined to apply the doctrine to commercial cases in general, or, indeed, if it overruled *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398 (1964). MR. JUSTICE WHITE quite properly does not rely specifically upon the views of the Department; six Members of the Court in *First Nat. City Bank* v. *Banco Nacional de*

---

trolled this one that counsel for respondents made the statement, relied upon by the Court, *ante*, at 692 n. 8: "The statement of an ambassador, like the statement of a lawyer, is not proof of anything. It is merely an assertion made by the representative of a sovereign as to the position taken by that sovereign in litigation." Brief for Respondent 17 n. 8. In this case, unlike in *The Navemar* case, it is precisely the position of the foreign sovereign with respect to property in its possession that is significant.

[9] The appellation *"Bernstein* letter" stems from the case *Bernstein* v. *N. V. Nederlandsche-Amerikaansche*, 210 F. 2d 375 (CA2 1954).

*Cuba,* 406 U. S. 759 (1972) (hereinafter *Citibank*), disapproved finally the so-called *Bernstein* exception to the act of state doctrine, thus minimizing the significance of any letter from the Department of State. *Id.,* at 773 (Douglas, J., concurring in result); *ibid.* (POWELL, J., concurring in judgment); *id.,* at 776–777 (BRENNAN, J., dissenting). Whether the act of state question in this case is viewed as being confined to a single dispute or as extending to a broad class of disputes, the task of defining the role of the Judiciary is for this Court, not the Executive Branch.[10]

### B

In concluding that the act of state doctrine should not apply to the purely commercial acts of sovereign nations, MR. JUSTICE WHITE relies heavily upon the widespread acceptance of the "restrictive theory" of sovereign immunity, which declines to extend immunity to foreign governments acting in a "private," or commercial, capacity. The restrictive theory of sovereign immunity has not been adopted by this Court, but even if we assume that it is the law in this country, it does not follow that there should be a commercial act exception to the act of state doctrine.

It is true, of course, that a particular litigant's claim may be as effectively defeated by application of the act of state doctrine as by a foreign government's invocation of sovereign immunity. But the doctrines of sovereign immunity and act of state, while related, differ fundamentally in their focus and in their operation. Sovereign immunity accords a defendant exemption from

---

[10] It is noteworthy that while the Department of State now takes the position that *Sabbatino* can be overruled without embarrassment to the conduct of foreign policy, the result in *Sabbatino* had been urged by the Solicitor General at the time. See Brief for United States as *Amicus Curiae* in *Sabbatino,* O. T. 1963, No. 16.

suit by virtue of its status. By contrast, the act of state doctrine exempts no one from the process of the court. Equally applicable whether a sovereign nation is a party or not, the act of state doctrine merely tells a court what law to apply to a case; it "concerns the limits for determining the validity of an otherwise applicable rule of law." *Sabbatino,* 376 U. S., at 438.[11] In the absence of "unambiguous agreement regarding controlling . . . principles" of international law, *id.,* at 428, the act of state doctrine commands that the acts of a sovereign nation committed in its own territory be accorded presumptive validity.

The act of state doctrine, " 'although it shares with the immunity doctrine a respect for sovereign states,' serves important policies entirely independent of that rule." *Citibank, supra,* at 795 (BRENNAN, J., dissenting), quoting *Sabbatino, supra,* at 438. The act of state doctrine is not mandated by the text of the Constitution, but it does have " 'constitutional' underpinnings." *Sabbatino, supra,* at 423.

> "It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and

---

[11] See also R. Falk, The Role of Domestic Courts in the International Legal Order 96–102 (1964); Henkin, Act of State Today: Recollections in Tranquility, 6 Col. J. Transnat'l L. 175, 178–180, 187–188 (1967).

for the community of nations as a whole in the international sphere." *Ibid.*[12]

As Mr. Justice Brennan has observed, the act of state doctrine reflects the notion that the validity of an act of a foreign sovereign is, under some circumstances, a "political question" not cognizable in our courts. The circumstances indicating the existence of a "political question" in *Sabbatino* included, as Mr. Justice Brennan summarized, "the absence of consensus on the applicable international rules, the unavailability of standards from a treaty or other agreement, the existence and recognition of the Cuban Government, the sensitivity of the issues to national concerns, and the power of the Executive alone to effect a fair remedy for all United States

---

[12] While *Sabbatino* found the act of state doctrine to reflect the "distribution of functions between the judicial and political branches of the Government," 376 U. S., at 427–428, it has also been suggested that a doctrine of deference based upon the absence of consensus as to controlling principles of international law allocates legal competence among nations in a manner that promotes the growth of international law. See generally R. Falk, The Status of Law in International Society 403–442 (1970); R. Falk, The Role of Domestic Courts in the International Legal Order 64–138 (1964). Whether considerations of its contribution to the development of international law provide a basis for the act of state doctrine independent of the notion of separation of powers is a question that the Court has not addressed and that we need not consider. It is worth noting, however, that the *Sabbatino* Court was sensitive to the fact that a court's invalidation of a foreign sovereign's acts on the basis of principles of international law that are not the subject of "unambiguous agreement," 376 U. S., at 428, is unlikely to be regarded as impartial. *Id.*, at 434–435. In the area of state responsibility for expropriations, the Court viewed the potential contribution of United States courts to the growth of international law as "highly conjectural," *id.*, at 434, and concluded that "progress toward the goal of establishing the rule of law among nations [is] best served by maintaining intact the act of state doctrine." *Id.*, at 437.

citizens who have been harmed." *Citibank, supra,* at 788; see *Sabbatino, supra,* at 427–437.

The doctrine of sovereign immunity, concerned only with the status of a party to a lawsuit, does not focus on the other circumstances just mentioned; it is simply not designed to be responsive to the particular considerations underlying the act of state doctrine. Whatever exceptions there may be to sovereign immunity ought not be transferred automatically, therefore, to the act of state doctrine.[13]

## C

I question the wisdom of attempting the articulation of any broad exception to the act of state doctrine within the confines of a single case. The Court in *Sabbatino,* aware of the variety of situations presenting act of state questions and the complexity of the relevant considerations, eschewed any inflexible rule in favor of a case-by-case approach. 376 U. S., at 428. The carving out of broad exceptions to the doctrine is fundamentally at odds with the careful case-by-case approach adopted in *Sabbatino.*

Indeed, it is difficult to discern the precise scope of the "commercial act" exception contemplated by MR. JUSTICE WHITE.[14] In the final analysis, however, it is un-

---

[13] At least one commentator has proposed discarding the doctrine of sovereign immunity (except with respect to diplomatic and military activity), while retaining the nonreviewability accorded by the act of state doctrine to official acts of a sovereign performed within its territory. R. Falk, The Role of Domestic Courts in the International Legal Order 139–145, 164–169 (1964).

[14] The precise contours of the restrictive theory of sovereign immunity, on which the commercial act exception is based, are themselves unclear. See, *e. g., Victory Transport, Inc.* v. *Comisaria General,* 336 F. 2d 354, 359–360 (CA2 1964); Falk, The Immunity of Foreign Sovereigns in U. S. Courts—Proposed Legislation, 6 N. Y. U. J. Int'l L. & Pol. 473, 477 (1973); Lauterpacht, The Problem of Jurisdictional Immunities of Foreign States, 28 Brit. Y. B. of Int'l L. 220, 222–226 (1951).

necessary to consider whether the exception would be responsive to the concerns underlying the act of state doctrine in every case to which it might apply.[15]   If the exception covers this case, it is unresponsive.

Cuba's retention of and refusal to repay the funds at issue in this case took place against the background of the intervention, or nationalization, of the businesses and assets of five cigar manufacturers.   As I have already indicated, the seizure and retention of the Dunhill funds were pursuant to the initial intervention decree.   For all practical purposes, the seizure of the funds once they arrived in Cuba is indistinguishable from the seizure of the remainder of the cigar manufacturers' businesses. The seizure of the funds, like the initial seizures on September 15, reflected a purpose to exert sovereign power to its territorial limits in order to effectuate the intervention of ongoing cigar manufacturing businesses. It matters not that the funds have been determined by a United States court in this case to have belonged to Dunhill rather than the cigar manufacturers.   What does matter is that Cuba retained the money in the course of its program of expropriating what it viewed as part and parcel of the businesses.[16]

The applicability of the act of state doctrine in these circumstances is controlled by *Sabbatino* itself.   As the Court there noted: "There are few if any issues in inter-

---

[15] The general observation that "more discernible rules of international law have emerged with regard to the commercial dealings of private parties in the international market" than with regard to "exercises of *governmental* powers," *ante*, at 704, does not, however, approach the finding of "unambiguous agreement regarding controlling legal principles" contemplated by *Sabbatino*.   376 U. S., at 428.

[16] Quite apart from the significance that may be attached to the label, I find it difficult to accept MR. JUSTICE WHITE's characterization of the course of conduct involved here as "purely commercial."

national law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens." 376 U. S., at 428.' Indeed, the absence of any suggestion that Cuba's intervention program was discriminatory against United States citizens [17] renders the lack of consensus as to applicable principles of law even more apparent here than in *Sabbatino*. See *Citibank*, at 785 (BRENNAN, J., dissenting). And unless one takes the position that the amount of money or the value of property seized materially affects the sensitivity of the issues, we are guided in this case by the following observation in *Sabbatino*:

> "It is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations." 376 U. S., at 430 (footnote omitted).

Regardless, then, of whether the presence of consensus as to controlling legal principles, or any other circumstances, would render the act of state doctrine inapplicable to some, or even most, acts that could be characterized as "purely commercial," the doctrine is fully applicable in this case.

### III

Since in my view the retention of and refusal to repay the funds at issue constitute an act of state that would ordinarily preclude an affirmative judgment against Cuba and the interventors, it is necessary for me to proceed to

---

[17] Under its view of the case as a run-of-the-mill commercial case, Dunhill does assert that the retention of the monies constitutes a discriminatory taking—the notion evidently being that Cuba has not generally repudiated its commercial debts. Supplemental Brief for Petitioner 15–17. But there has been no claim that Cuba has retained only those preintervention-shipment payments made by United States citizens, or that the intervention program was in any other sense discriminatory.

the second question on which we granted certiorari—whether Dunhill may nonetheless secure an affirmative judgment in the peculiar circumstances of this case.

## A

A brief recapitulation of the facts is necessary to understand Dunhill's contention that it is entitled to an affirmative recovery in spite of the presence of an act of state. Dunhill was one of three importers that had at the time of the intervention received cigars for which it had not yet paid. During the three months following intervention, each of the importers paid the interventors the amounts due for preintervention shipments. And in the period between intervention and February 1961, each of the importers took delivery of additional shipments, for which payment was not made.

This suit stems from nine suits brought against the importers by the former owners of the five intervened firms, *inter alia,* to restrain payment to anyone else for goods manufactured by their firms or bearing their mark, and to recover for all such goods that the importers had already received. The interventors brought suit in the names of the intervened firms to enjoin the former owners' counsel from pursuing the nine actions in the firms' names, and to substitute their own attorneys for those of the former owners in the same nine suits. The District Court ruled as a preliminary matter that the interventors and not the former owners were entitled to sue for payment for the postintervention shipments. *F. Palicio y Compania, S. A.* v. *Brush,* 256 F. Supp. 481 (SDNY 1966), aff'd, 375 F. 2d 1011 (CA2), cert. denied *sub nom. Brush* v. *Republic of Cuba,* 389 U. S. 830 (1967). The original nine actions were then consolidated for trial, with the interventors pursuing their claim for payments for post-intervention shipments, and both the former owners and the interventors pursuing their claims to the payments for preintervention shipments.

The District Court concluded that the former owners, not the interventors, were entitled to payment for preintervention shipments. Under its view that the interventors' refusal to return the monies paid for preintervention shipments did not involve an act of state, the District Court set off that amount ($477,000) against the amount owed by the importers to the interventors for postintervention shipments ($700,000). *Menendez v. Faber, Coe & Gregg, Inc.,* 345 F. Supp. 527 (SDNY 1972). Alone among the importers, Dunhill had paid the interventors more for preintervention shipments ($148,000) than it owed for postintervention shipments ($93,000). Accordingly the District Court directed that an "affirmative judgment" be entered in Dunhill's favor.[18]

The Court of Appeals found an act of state in Cuba's retention of the monies paid for preintervention shipments. It interpreted the various views expressed in *Citibank* as indicating that this Court would nevertheless uphold the importers' counterclaims up to the limits of the respective claims asserted against them by the interventors. But the court reversed the judgment of the District Court insofar as it granted Dunhill affirmative recovery. *Menendez v. Saks & Co.,* 485 F. 2d 1355 (CA2 1973). The second question on which we granted certiorari is whether, if Cuba's conduct constitutes an act of state, Dunhill may nonetheless assert its full counterclaim in the circumstances of this case, where the counterclaim exceeds Cuba's claim against it but is less than the amount owed to Cuba by the importers as a group.

B

The Court in *Citibank* held that the act of state doc-

---

[18] This was done by entry of judgment for the interventors against Dunhill for $93,000 and in favor of Dunhill against the interventors for $148,000.

trine does not necessarily bar a defendant from litigating the merits of a limited counterclaim against a foreign state suing in the courts of this country. Petitioner there was an American bank whose branches in Cuba had been nationalized. The bank responded by selling the collateral securing its loan of $10 million to the respondent Banco Nacional de Cuba, an instrumentality of the state. Banco Nacional then sued for the excess proceeds realized from the sale, and First National counterclaimed for an equal amount in damages resulting from the expropriation of its property. For various reasons asserted in three separate opinions, a bare majority of the Court allowed prosecution of the counterclaim, limited as it was to the amount recoverable against First National.

Because we are concerned here only with the status of a counterclaim in excess of a foreign state's principal claim, the precise question the Court addressed in *Citibank*—whether a counterclaim limited by the amount of the foreign state's claim may be barred by the act of state doctrine—does not cover the present situation.[19] The approach adopted in MR. JUSTICE BRENNAN's dissent in *Citibank,* which would have barred a counterclaim limited by the amount of a foreign state's claim, would be sufficient, *a fortiori,* to bar Dunhill's excessive counterclaim. But even putting that approach aside, the judgment of the Court of Appeals denying affirmative relief to Dunhill should be affirmed.

An affirmative judgment for the excess of a counterclaim over a foreign state's principal claim is indistinguishable in any important respect from an ordinary affirmative judgment. In this case, the situation is precisely as it would be if Cuba had voluntarily recognized the validity of Dunhill's claim in an amount equal to its

---

[19] Whether *Citibank*'s approval of a setoff is applicable to the facts of this litigation is questioned in the petition in *Republic of Cuba* v. *Saks & Co.,* No. 73-1287.

own, the parties had agreed extrajudicially to consider the claims as canceling each other out *pro tanto*, and Dunhill had then sued Cuba for the unsettled remainder of its claim. The courts would then be presented with an unadorned suit against a foreign sovereign, barred by the act of state doctrine.[20] But an affirmative judgment offends the policy of judicial abstention from interference in international relations to an equal degree, whether it is founded upon a naked suit against a foreign state or an excessive counterclaim.[21]

Dunhill contends, however, that the nature of the act of state question is affected by the fortuity that its counterclaim, while exceeding Cuba's principal claim against it, is for a lesser amount than the sum of the judgments entered in favor of Cuba against the three

---

[20] The bar of sovereign immunity, which yields to the extent of a counterclaim against a sovereign plaintiff and no further, *National City Bank* v. *Republic of China,* 348 U. S. 356 (1955), would be absolute quite apart from the availability of the act of state defense, unless the restrictive theory of sovereign immunity is followed and the case is considered purely commercial.

[21] When this case was initially briefed and argued, Dunhill attempted to distinguish an excessive counterclaim from a simple principal claim on the ground that the former was covered by the *Bernstein* letter in *Citibank,* in which the State Department advised the Court that foreign policy considerations did not require application of the act of state doctrine "to bar consideration of a defendant's counterclaim . . . in [that] or like cases." 406 U. S., at 764. The letter in *Citibank* provided little support for Dunhill, since it contained several qualifications to its determination that the act of state doctrine need not be applied, one of which was that "the amount of the relief to be granted is limited to the amount of the foreign state's claim." *Banco Nacional de Cuba* v. *First Nat. City Bank,* 442 F. 2d 530, 537 (CA2 1971). Since the State Department has now made known its view that the act of state doctrine need not be applied in this case, it is no longer necessary for Dunhill to rely on the letter in *Citibank.* But, as I have already noted, the significance of any views expressed by the State Department is minimal after *Citibank.*

importers whose cases were consolidated for trial. This contention suffers from two fatal flaws.

First, the actions against Dunhill and the other importers were not merged; they were simply consolidated for trial in the interest of economy.[22] The interventors, as substituted plaintiffs in the actions originally filed by the owners, asserted separate causes of action against each importer; no single transaction involved or gave rise to a claim against more than one importer. The actions thus did not lose their separate identities because of the consolidation.[23] In these circumstances, a ruling allowing for a counterclaim on the theory that it does not exceed the foreign state's total judgments against those parties that happen to be before the District Court would be capricious indeed. The limitation on counterclaims would then be determined by the presence or absence of actions suitable for consolidation at a particular time in a particular court,[24] and upon their outcomes.

In any event it has become quite clear that execution of Dunhill's affirmative judgment against the judgment debts that the other importers owe to the interventors would be prohibited by the Cuban Assets Control Regulations, 31 CFR pt. 515 (1975), promulgated by the Treasury Department's Office of Foreign Assets Control pursuant to the Trading With the Enemy Act, 50 U. S. C.

---

[22] "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson* v. *Manhattan R. Co.*, 289 U. S. 479, 496–497 (1933) (footnote omitted).

[23] See 9 C. Wright & A. Miller, Federal Practice and Procedure § 2382, pp. 254–256 (1971).

[24] We are informed that the interventors had pending at least four other cases against tobacco importers in the District Court at the time the present cases were tried. See Brief for Respondents 26. The reason they were not consolidated with the present case is not a matter of record here.

App. § 5. The regulations prohibit, except as authorized by the Secretary, all transactions involving property in which Cuba has an interest, direct or indirect, including "the levy of or under any judgment, decree, attachment, execution, or other judicial or administrative process or order."[25] This scheme by which the Executive has frozen Cuban assets in the United States is designed to preserve a fund for the ultimate, orderly satisfaction of claims against Cuba by American nationals if diplomatic alternatives prove unavailing. See *Citibank*, 406 U. S., at 794 (BRENNAN, J., dissenting). In furtherance of this policy, the Treasury Department has stated that it will refuse "to authorize a judgment creditor of Cuba to execute against assets of Cuba which have been frozen" under the regulations.[26] An affirmative judgment in

---

[25] Title 31 CFR § 515.201 (b) (1975) prohibits all transactions and transfers that "involve property in which [Cuba], or any national thereof, has at any time on or since [July 8, 1963] had any interest of any nature whatsoever, direct or indirect." "Transfer" is defined to mean any act or transaction the purpose, intent, or effect of which is to "create, surrender, release, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property," including execution of a judgment. § 515.310. Property is defined to include a judgment. § 515.311. Discharge of a judgment debt on behalf of Cuba, even if by execution of a judgment against Cuba, would thus be prohibited.

[26] After certiorari was granted in this case, counsel for respondents corresponded with the Acting Director of the Office of Foreign Assets Control, stating:

"Dunhill had assumed that if it secured a judgment against Cuba, it could execute that judgment against money owing to Cuba from other creditors and it had in fact attempted to attach funds owing to Cuba by Faber, Coe & Gregg, another cigar importer whose claim is likewise in litigation. . . .

"It would be helpful if you would confirm my understanding that, generally speaking, you will not issue a license to permit a judgment-creditor of Cuba to execute against assets of Cuba which have been frozen pursuant to the Foreign Assets Control regulations. . . ."

The Acting Director responded by a letter confirming this under-

favor of Dunhill could not, therefore, be satisfied out of the other importers' judgment debts to Cuba, which are frozen for the benefit of all creditors or for such other disposition as future diplomatic negotiations direct.[27]  To allow entry of an affirmative judgment against Cuba in these circumstances would thus mark a significant departure from our consistent policy of avoiding potential interference with the executive channels through which our Nation deals with others, while securing to Dunhill only the very speculative prospect of obtaining a preference over other United States claimants should national policy on the subject of Cuban assets change in the future.

IV

In conclusion, I would hold that the course of conduct undertaken by the interventors with respect to payments made for preintervention shipments constitutes an act of state, and that Dunhill is not entitled to an affirmative judgment on its counterclaim relating to those payments. I would affirm the judgment of the Court of Appeals.

---

standing of the licensing policy.  Both letters appear in Brief for Respondents, App. B.

[27] Execution of an affirmative judgment would, of course, be barred whether the basis for that judgment was the presence of other parties with judgment debts to Cuba, the absence of a sovereign act, or the application of a commercial act exception to the act of state doctrine.  The point is particularly appropriate, however, in response to the contention that the presence of other parties with judgment debts to Cuba justifies an affirmative judgment in this case; this contention proceeds on the assumption that the policies behind the act of state doctrine would otherwise bar affirmative recovery by Dunhill, and permits affirmative recovery only because of the purported unfairness that would result if Cuba's debt to Dunhill were not deducted from its recovery from the other importers.  As has been shown, granting an affirmative judgment to Dunhill in this way would not affect the fairness of the disposition, since execution of the judgment would be barred by the Treasury Department's freezing of Cuban assets for the benefit of all American nationals with claims against Cuba.