Edward HAVEN, etc., et al., Plaintiffs,

v.

**RZECZPOSPOLITA POLSKA
(REPUBLIC OF POLAND),
et al., Defendants.**

No. 99 C 1727.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1999.

As Amended Oct. 4, 1999.

Order Supplementing Decision,
Oct. 13, 1999.

948

Eric V. Puchala, Chicago, IL, for Plaintiff.

Owen C. Pell, Karen M. Asner, White & Case LLP, New York City, for Defendants the Republic of Poland, State Treasury of the Republic of Poland and PZU.

Jeremy D. Margolis, Jeffrey P. DeJong, and Ted A. Donner of Altheimer & Gray, Chicago, IL, for Defendant Warta.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Four name plaintiffs—Edward Haven as representative of the Estate of Maksymilian Rechtszafen, Evelyn Ruebner as representative of the Estate of Herbert Prerauer, Allen Welbel and Mark Krug—have brought this putative class action against Rzeczpospolita Polska ("Poland") and Skarb Panstwa, Rzeczpospolita Polska (the State Treasury of Poland, referred to here simply as "Treasury"), charging (1) their wrongful seizure and expropriation of real property owned by plaintiffs or their predecessors and by other Jewish property owners during and shortly after World

War II and (2) their interference with and prevention of the performance of insurance contracts between plaintiffs and other class-member property owners on the one hand and insurers Warta S.A. ("Warta") and Powszechny Zaklad Ubezpieczen S.A. ("PZU") on the other. Plaintiffs have also sued Warta and PZU for breach of those property and life insurance contracts.

From the time of their first appearances in this court, all defendants have moved for dismissal for, among other things, a claimed lack of federal subject matter jurisdiction due to foreign sovereign immunity. Because the very nature of a jurisdictional challenge calls for no more than a surface examination (without substantive evaluation) of the abhorrent conduct alleged in the First Amended Class Action Complaint ("Complaint"), this opinion will sketch out those allegations and then turn to the relevant legal analysis. And because that analysis discloses that this court does indeed lack subject matter jurisdiction under the Foreign Sovereign Immunities Act ("Act," 28 U.S.C. §§ 1330, 1602–1611 [1]), this action must be and is dismissed.[2]

### Background

■ Everyone agrees that the four defendants are "foreign states" or "agencies or instrumentalities of foreign states" under the Act: Poland and its Treasury (collectively "Governmental Defendants") as a tautological matter, Warta and PZU (collectively "Insurance Company Defendants") because they were owned and operated by the Polish government during all relevant times. As for plaintiffs, who are alleged to be citizens of the United States

and residing here as of the date of the Complaint, nothing in their papers specifies when each plaintiff became a United States national. From the nature of plaintiffs' claim, though, each of them (or his or her predecessor in interest) was a Polish national at the time that the property at issue was expropriated and the applicable policy or policies was or were allegedly breached. That being so, plaintiffs would not be "nationals of the United States" within the coverage of the Agreement Between the United States and Poland Regarding Settlement of Claims of United States Nationals (the "Treaty," 11 U.S.T. 1953).

In that respect, it is true that "nationals of the United States" is not a term expressly defined in the Treaty, nor is there caselaw on the subject. But the Annex to the Treaty provides that "claims of nationals of the United States are rights and interests in and with respect to property nationalized, appropriated or otherwise taken by Poland which, from the date of such nationalization, appropriation or other taking to the date of entry into force of this Agreement, have been continuously owned...directly by natural persons who were nationals of the United States." That use of the past tense plainly requires a claimant to establish United States citizenship at or before the time of the alleged taking, as well as continuous ownership of the subject property from the time of the taking until the Treaty's effective date of July 16, 1960. Here plaintiffs have offered no showing to trigger application of the Treaty under those criteria.

---

**1.** All citations to the Act take the form "Act § —," using the Title 28 numbering.

**2.** Because the absence of subject matter jurisdiction is a threshold dispositive issue, this opinion does not address such other potential grounds for dismissal as statute of limitations, the local action doctrine, the Act of State doctrine or venue (see *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 119 S.Ct. 1563, 1570, 143 L.Ed.2d 760 (1999)). It is worth noting, however, that the Act confers

personal jurisdiction over foreign states to the same extent that it confers subject matter jurisdiction—that is, as to every claim that falls within one of the Act's exceptions to foreign sovereign immunity (28 U.S.C. § 1330 and Sections 1605–1607; *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488–91, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). That being so, this case does not pose the question of priorities recently dealt with by the Supreme Court in *Ruhrgas AG.*

To turn now to the background of foreign sovereign immunity in this country, before 1952 all foreign sovereigns were entitled to assert absolute immunity from suit in United States courts (see *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). Then the 1952 issuance of the Tate Letter[3] by the State Department announced an executive policy that would restrict immunity to suits involving the public acts of a foreign sovereign, while eliminating such immunity for commercial acts (see, e.g., *Jackson v. People's Republic of China,* 794 F.2d 1490, 1493 (11th Cir.1986)). Nearly a quarter century later (in 1976) Congress entered the picture with the Act, which both (1) codified and clarified that restrictive theory of sovereign immunity and (2) granted subject matter jurisdiction and personal jurisdiction to United States courts over lawsuits and states, respectively, that fall within certain exceptions to sovereign immunity.

This Court's August 24, 1999 memorandum opinion and order ("Opinion") held generally, for the reasons most recently expressed by the Court of Appeals for the District of Columbia, that the Act conferred subject matter jurisdiction over claims arising before 1952. But the Opinion deferred decision as to the applicability of any of the exceptions to sovereign immunity set out in the Act. This opinion now addresses those exceptions.

### Lack of Subject Matter Jurisdiction

 Foreign countries enjoy a presumption of immunity in United States courts (see, e.g., 28 U.S.C. §§ 1330(a) and (b); *Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir.1994)). It is also clear that the Act's exceptions provide the exclusive set of circumstances in which a foreign state will be denied such immunity.[4] And although the party seeking immunity retains the burden of persuasion

throughout, once a defendant is shown to be a "foreign state" under the Act the burden of production shifts to plaintiff to prove that one of the Act's exceptions to immunity applies (see, e.g., *Byrd v. Corporacion Forestal y Industrial de Olancho S.A.,* 182 F.3d 380, 388 (5th Cir.1999); *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 372 (7th Cir.1985) (per curiam)).

Here plaintiffs do not challenge defendants' "foreign state or instrumentality" status under the Act, so the burden of production rests on plaintiffs to demonstrate that defendants' claims fall within one of the immunity exceptions. In an effort to meet that burden, plaintiffs contend that subject matter jurisdiction exists pursuant to four of the Act's provisions: (1) the "subject to" exception for international agreements under Section 1604; (2) the waiver exception under Section 1605(a)(1); (3) the commercial activity exception under clause three of Section 1605(a)(2); and (4) the international law violation exception under clause two of Section 1605(a)(3). Those contentions are dealt with in turn.

### Section 1604: The Treaty

In an effort to advance economic relations between the two countries, the United States entered into the Treaty with Poland effective July 16, 1960 (11 U.S.T. 53). Poland there agreed to pay $40 million to the United States "in full settlement and discharge of all claims of *nationals of the United States . . .* against the Government of Poland on account of the nationalization and other taking by Poland of property and of rights and interests in and with respect to property, which occurred on or before the entry into force of this Agreement" (*id.* Art. I.A, emphasis added).

---

**3.** Reprinted in 26 Department of State Bull. 984–85 (1952) and in *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

**4.** Section 1602; H.R.Rep. No. 94–1487, at 12 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610; *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

Both plaintiffs and defendants seek to invoke Section 1604 of the Act in an effort to benefit from application of the Treaty. That statutory provision prescribes the limit on a foreign state's immunity emphasized in the following quotation:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

Because the Treaty became effective 16 years before the Act's passage, the statute must yield to any conflicting provisions or effects of the Treaty. For their part, plaintiffs claim that the Treaty created an additional "exception" to foreign sovereign immunity because it constituted Poland's waiver of immunity as to all expropriation and related claims. To the contrary, defendants say that all expropriation and related claims of United States nationals were effectively settled by the Treaty. As the following discussion reflects, both sides' contentions miss the mark by a wide margin.

■ Plaintiffs' Mem. 3 asserts that Poland's entry into the Treaty somehow "waived its immunity and the immunity of defendants PZU and Warta" as to any plaintiff whose claims were not settled by the Treaty—that is, as to any claimant who either was not a United States national by the time of the taking or who did not own property in Poland continuously from the time of the taking until 1960 (Treaty Annex A). Defendants' July 23, 1999 Mem. 23 takes the reverse side of that argument, contending that the Treaty represents a "final settlement by Poland for [all] nationalized property."[5] Thus defendants urge that the Treaty bars all such claims by any United States national, no matter when the person obtained citizenship in this country.

■ In fact the impact of the Treaty is much less extensive—though in different ways—than either party would have it. To abrogate sovereign immunity, an international agreement must expressly state its intention to do so (Amerada Hess, 488 U.S. at 442, 109 S.Ct. 683; Frolova, 761 F.2d at 378 and cases cited there). Hence the scope of the waiver of Polish sovereign immunity contemplated by the Treaty must be coextensive with the class of claims that were settled by the Treaty.

As stated earlier, Poland and the United States engaged in a quid pro quo exchange: Poland's payment of $40 million in return for settlement of the wrongful expropriation (and other related) claims of persons who were United States nationals at the time of the taking and who also owned property in Poland continuously from the time of the taking until 1960. Because plaintiffs and their predecessors were not within that category, plaintiffs' claims were not settled by the Treaty, and by the same token Poland has not, by ratifying the Treaty, waived its immunity as to plaintiffs' claims. None of the authorities cited by either party suggests a waiver of immunity or a settlement of claims by the Treaty beyond the Treaty's clearly stated scope.[6] In sum, the Treaty is simply not relevant to this action.

### Section 1605(a)(1): Waiver

Plaintiffs also contend that defendants have either expressly or impliedly waived their immunity pursuant to Section 1605(a)(1). That provision negates foreign state immunity in any case:

> in which the foreign state has waived its immunity either explicitly or by implica-

---

5. That Memorandum was filed early in the game (in opposition to plaintiffs' motion for a temporary restraining order), but defendants advanced the same position of the Treaty's exclusivity throughout the briefing on their motions to dismiss.

6. Nothing suggests that any plaintiff is a United States national who falls within the stated scope of the Treaty and yet failed to make a claim in the forum provided by the Treaty, the United States Foreign Claims Settlement Commission. This opinion therefore need not consider what effect the Treaty might have on such a claimant.

tion, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

■ As with waiver defenses generally, what is required in this area is an intentional and knowing relinquishment of the legal right not to be forced to defend on foreign ground (see, e.g., *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C.Cir.1994), requiring proof of a subjective intent to waive immunity; *Castro v. Saudi Arabia*, 510 F.Supp. 309, 312 (W.D.Tex.1980)). Courts have found such a relinquishment in situations where a defendant either itself or through its authorized agent [7] expressly waived immunity,[8] or failed to assert the defense of immunity in an answer or other responsive pleading,[9] or consented to arbitration in a United States forum,[10] or consented to the application of United States law,[11] or itself brought suit in or used United States courts [12] (see generally H.R.Rep. No. 94–1487, at 18 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6617).

■ In this instance there has been no express waiver of immunity by any defendant, either by the Treaty or otherwise. As for the Treaty, the earlier discussion has shown its plain inapplicability to the claims asserted here. And as for any other claimed basis for a finding of waiver, plaintiffs first offer the disingenuous added argument that their attorney's telephone conversations with two consular employees (both Polish attorneys), during which those employees did not assert Poland's sovereign immunity, constituted an implied waiver of such immunity. But there is nothing to suggest that such officials had either the actual or the apparent authority to waive immunity on behalf of either the Governmental Defendants or the Insurance Company Defendants, nor can such a waiver be reasonably inferred from their orally having raised questions other than sovereign immunity. And similarly, the letter sent ex parte to this Court by the Polish Consul in Chicago before defendants' appearance in this action [13]—a letter that stated (erroneously) an error in plaintiffs' foreign service of process—cannot by any stretch of the term be deemed a "known relinquishment" of foreign sovereign immunity.

None of those actions, either individually or in combination, rises to the level of emphatic consent to the jurisdiction of the United States required by Section 1605(a)(1). As stated in *Drexel Burnham Lambert Group Inc. v. Committee of Receivers*, 12 F.3d 317, 326 (2d Cir.1993) (citation omitted), after citing various Courts of Appeals decisions to the same effect, including *Frolova* from this Circuit:

> [W]e must bear in mind that "the implied waiver provision of Section

---

**7.** See *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 722 F.Supp. 1032, 1038 (S.D.N.Y.1989)(agency law dictates that actions by agent within scope of his agency are binding on principal).

**8.** See, e.g., *Sotheby's Inc. v. Garcia*, 802 F.Supp. 1058, 1063 (S.D.N.Y.1992).

**9.** See, e.g., *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 477 F.Supp. 615, 619 n. 9 (S.D.N.Y.1979).

**10.** See, e.g., *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F.Supp. 1340, 1351 (S.D.N.Y.1988).

**11.** See, e.g., *Eckert Int'l, Inc. v. Government of the Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 79–81 (4th Cir.1994).

**12.** See, e.g., *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 79–80 n. 18 (3rd Cir.1994)(finding that a sovereign that brings suit in the United States subjects itself to jurisdiction over matters incident to suit, including counterclaims); *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 656 (9th Cir. 1996) (intervenor foreign-government-instrumentality refiner held to have waived part of its immunity under Act as to counterclaims based on the same transaction or occurrence on which it was bringing suit).

**13.** Plaintiffs' attorney hardly aids their cause by the misleading characterization of that letter as "this answer to the case" and as "Consul Pawlak's first written answer in this case" (Plaintiffs' Mem. 15). That is just wrong, and counsel should know better.

1605(a)(1) must be construed narrowly," and that any waiver must accordingly be "unmistakable" and "unambiguous."

 Those authorities teach that courts should be particularly wary of stretching the doctrine of implied consent too far. Carried beyond its intended scope, the implied consent exception to sovereign immunity could subvert the need to establish minimum contacts with a forum.[14] Any such extension would impermissibly put foreign states in a position far worse than that of any private person in the United States courts (see, e.g., *Chicago Bridge & Iron Co. v. Islamic Republic of Iran,* 506 F.Supp. 981, 987 (N.D.Ill.1980)).

*Section 1605(a)(2): Commercial Activity*

Next plaintiffs urge that defendants' actions fall within the commercial activity exception, more specifically the third clause of Section 1605(a)(2)(emphasis added):

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case-
>
> * * * * * *
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; *or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.*[15]

But the analysis that follows shows that plaintiffs have double difficulty as to the Governmental Defendants: They fail to satisfy both the "commercial activity" and "direct effect" requirements. And as to the Insurance Company Defendants plaintiffs fail (at least) to satisfy the "direct effect" test.

(1) *Commercial Activity*

 As used in Section 1605(a)(2), "commercial activity" is meant to distinguish activity in what our society would view as governmental, public or sovereign enterprises (such as running police departments or parks) from acts of foreign states or their agencies or instrumentalities acting in what we would deem a commercial capacity (such as operating hotels or cruise ships). It is obvious that governmental expropriation of private property under governmental authority—whether legitimate or illegitimate—is the classic type of activity coming under the first rubric and not the second. Whatever else may be said of the Governmental Defendants' alleged conduct, it is not "commercial activity" (see *Magnus Electronics, Inc. v. Royal Bank of Canada,* 620 F.Supp. 387, 389–90 (N.D.Ill.1985) and cases cited there). As to the Insurance Company Defendants, of course, the writing of insurance coverage is just as typically an example of private commercial activity, thus forcing consideration of the "direct effect" aspect of the statutory exception.

(2) *Direct Effect* [16]

 In the portion of their contentions that merits the most careful consideration,

**14.** As n. 2 reflects, 28 U.S.C. § 1330 confers personal jurisdiction over states whose activities have been found to come within one of the Act's exceptions to foreign sovereign immunity.

**15.** It is clear that this action, predicated as it is on the alleged expropriation of the real property of Polish nationals and on the alleged interference with and breach of insurance contracts in Poland, is not within the statute's first clause because defendants' activity was not "carried on in the United States by the foreign state." And of course the second clause of the statute is equally inapplicable because no action by defendants can be characterized as "an act performed in the United States."

**16.** This section's text will omit the constant repetition of quotation marks surrounding the term "direct effect"—but that term is used throughout in its statutory sense.

plaintiffs seek to read the Act's direct effect requirement as though the economic impact on a United States party, caused by a foreign government's or its instrumentality's actions on its own soil, were itself enough to subject the foreign sovereign or instrumentality to suit here. That possible reading is scarcely one that would do violence to the English language: Damage to the pocketbook can certainly be viewed as a direct effect sustained by the victim of that damage.

But on examination such a statutory construction would prove too much: It would essentially eliminate sovereign immunity as such, for all a United States plaintiff would then have to show would be any economic damage caused by the alleged wrongful conduct of the foreign government or instrumentality in its own territory. As this Court said in *Magnus Electronics*, 620 F.Supp. at 390 (citation and footnote omitted):

> Due process constraints preclude such a broad sweep against private litigants, and it would be anomalous indeed if a foreign nation could be haled into court here on so slender a connection when a non-sovereign could not.

It is scarcely surprising, then, that several Courts of Appeals' opinions have held or indicated that financial injury suffered in the United States is insufficient of itself to meet the direct effect requirement (see the Seventh Circuit's *Rush–Presbyterian–St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 581–82 & n. 9 (7th Cir.1989) and such opinions elsewhere as *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1237–38 (10th Cir.1994) and *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C.Cir.1990)). In that respect the situation here is conceptually comparable to that in *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511 (D.C.Cir.1988), where an American citizen had moved to Saudi Arabia to work on a roadway, and at some point during the job an agency of the Saudi Arabian government took over the project and guaranteed payment of plaintiff's contract salary. When the roadway was completed plaintiff returned home to the United States, believing that his remaining pay would be forwarded to him there. It never was. *Zedan, id.* at 1515 found no direct effect in the United States:

> Appellant's injury, while financial rather than personal, was definitely suffered in Saudi Arabia, for it was there that the Ministry of Communications breached its contract with him. While it is true that the breach continued after appellant left Saudi Arabia, the breach's effect in the United States cannot be said to be direct, for this effect is due to an intervening event—appellant's return here. *See Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978)("The common sense interpretation of a 'direct effect' is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."), *aff'd mem.*, 607 F.2d 494 (D.C.Cir.1979).

■ By like reasoning, plaintiffs' or their predecessors' injuries were suffered in Poland, where their properties were taken and where their insurance contracts were breached. Even though the nonrestitution of the properties and the nonpayment of insurance continued after plaintiffs (or their predecessors in interest) had moved to the United States, under the cases that did not amount to a direct effect in the United States. If anything, plaintiffs may be viewed as having an even lesser claim to such a direct effect than *Zedan* did, because they (unlike Zedan) were not United States citizens at the time of the original injury. And even closer to home than *Zedan*, see the discussion in *Princz*, 26 F.3d at 1172–73 (adhering to *Zedan* and to other cases elsewhere standing for the same principle).

None of the cases cited at Plaintiffs' Mem. 21–22 for findings of a direct effect in the United States is analogous to plaintiffs' situation. Each of those scenarios involved a business transaction that initially transpired between a foreign sovereign or instrumentality and a business located in the United States, with either the origi-

nal contract having called for payment to be made in the United States or the foreign sovereign having sought out the American business. By contrast, here the property involved was located in Poland and the insurance contracts were formed in Poland with Polish citizens. In those circumstances, plaintiffs' present desire to be restored or repaid in the United States is irrelevant to the determination of the direct effect of defendants' actions.

That conclusion really flows a fortiori from a case such as *Princz,* where an American citizen sought money damages for injuries he had suffered and slave labor he had performed while a prisoner in a Nazi concentration camp. *Princz, id.* at 1172 found that Germany's current use of the United States' mail, wire and banking systems to administer pension and other reparation programs for victims of the Third Reich did not give rise to the required direct effect in the United States:

> [S]uch activities, conducted years after the alleged "commercial activity" giving rise to this suit, can not be considered an "immediate consequence" of the enslavement of Mr. Princz and others. Again, there are too many intervening elements between the asserted cause and effect.

This case lacks even that attenuated (and itself inadequate) nexus, for Poland has not launched any such United–States–based activities to right the wrongs identified in the Complaint.

Hence even if the Governmental Defendants' expropriations of plaintiffs' properties had constituted "commercial activities" within the meaning of Section 1605(a)(2), neither those activities nor the Insurance Company Defendants' failure to fulfill the insurance contracts (contracts that were themselves such "commercial activities") had a "direct effect" in the United States in the statutory sense. No defendant's actions thus fall within the commercial activity exception to sovereign immunity.

*Section 1605(a)(3): International Law Violation*

Finally, plaintiffs seek to ground their last predicate for subject matter jurisdiction in Section 1605(a)(3):

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> * * * , * * *
>
> (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

But the required phrase-by-phrase and clause-by-clause parsing of that provision clearly demonstrates its inapplicability here.

It may be assumed for this purpose (without necessarily deciding) that the "rights in property" of plaintiffs and their predecessors were "taken in violation of international law" and "are in issue" here. Although the Complaint is not predicated on any Polish governmentally-perpetrated genocide that numbered any of the name plaintiffs' antecedents among its victims, plaintiffs do allege the existence of Polish pogroms (both during and after the German-perpetrated Holocaust) that carried out the Polish government's antisemitic policies and that played an integral part in the inability of the plaintiff class members to have obtained any recompense—either in kind or money—for the totally illegal expropriation of Jewish-owned property in Poland.[17] It is unnecessary to recite the

---

17. According to Complaint ¶ 9, in 1996 and again in 1998 the Polish government admitted its involvement through mea culpa acknowl-

edgments by its Foreign Minister and then by its President.

appalling details that may be found in histories of the period or in the Complaint (or, with many more individualized accounts, in the similar complaint now pending in the United States District Court for the Southern District of New York, *Garb v. Republic of Poland,* No. CV 99–3487) to see the presence of what have become known as "crimes against humanity" in the modern evolution of international law. And if indeed the Governmental Defendants and the Insurance Company Defendants were implicated in—or were even the beneficiaries of—those crimes, common humanity would also appear to cause them to make reparations in the same way that reparations, at long last, have come or have begun to come from the German government, from German banks and from Swiss banks.

But this Court's authority does not extend to serving as the enforcing agent for matters of conscience, or of justice in the abstract. Just this last Term a Supreme Court majority held that the equitable powers of federal courts are limited to the scope of equity jurisdiction exercised by England's High Court of Chancery at the time of adoption of the Constitution and the enactment of the Judiciary Act of 1789 (*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* —— U.S. ——, 119 S.Ct. 1961, 1968, 144 L.Ed.2d 319 (1999))—and history teaches that was an era of complete immunity of foreign sovereigns from suit in this country's courts (*Verlinden B.V.,* 461 U.S. at 486, 103 S.Ct. 1962).

 Hence no federal court is vested with a roving commission to force any foreign government to do equity. If any such government fails or refuses to act in its governmental capacity as conscience would command, no federal court is empowered to force it to do so except as Congress has specified. Nor can this Court's decision be driven by the assertions in plaintiffs' Surreply to Defendants' Motions To Dismiss that plaintiffs cannot obtain justice (or even a fair trial) in the Polish courts. Instead this Court remains bound by the jurisdictional limitations imposed by Congress, and this opinion returns to that task.

 As for the first alternative contained in Section 1605(a)(3), it is necessary to remember that the "rights in property" that are "in issue" here are (1) Polish real estate and (2) proceeds of insurance that should have been paid for the expropriation of that real estate. But neither "that property" nor "any property exchanged for such property" is alleged to be "present in the United States"—certainly a truism as to the real estate itself, and an unsupported and unsupportable notion as to the insurance proceeds.

 Nor is the second alternative in the same subsection available to save plaintiffs' claims for federal court resolution. For that purpose plaintiffs do in part satisfy the first clause of that alternative: As to the insurance proceeds but not as to the real estate itself, "that property or any property exchanged for such property," on the allegations of the Complaint, "is owned or operated by an agency or instrumentality of the foreign state"—here the Insurance Company Defendants. But nothing has been proffered to suggest that either Warta or PZU "is engaged in a commercial activity in the United States" (see *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation,* 730 F.2d 195, 204 (5th Cir. 1984)(per curiam)).[18] Once again, the only connection this case has to the United States is the plaintiffs' after-the-fact decision to move to the United States and acquire citizenship here.

In short, this last possible string to the bow of subject matter jurisdiction is broken as well. Plaintiffs have not met their

---

18. It will be recalled that the affirmative answer to the existence of the two insurers' "commercial activity" in the earlier section of this opinion bearing that caption was reached in the context of the Section 1605(a)(2) requirement of commercial activity *elsewhere,* not in the United States.

burden of production on the Section 1605(a)(3) exception either.

*Conclusion*

Because defendants' charged actions do not come within any of the exceptions to sovereign immunity specified in the Act, this Court lacks subject matter jurisdiction over this action. Accordingly the motions to dismiss filed by all defendants—one by Poland, Treasury and PZU collectively and the other by Warta alone—are granted. This action is dismissed.[19]

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

■ This Court's September 29, 1999 memorandum opinion and order ("Opinion"[1]) dismissed this action for lack of subject matter jurisdiction, having explained in detail why the conduct ascribed by the Complaint to the four defendants—Poland, Treasury, Warta and PZU—does not come within any of the exceptions to sovereign immunity specified in the Foreign Sovereign Immunities Act ("Act"). Counsel for plaintiffs immediately filed a Motion To Reconsider and Vacate the Court's Order To Dismiss the Case ("Motion"), pointing out correctly that an earlier minute order had provided for plaintiffs' opportunity to submit some supplemental factual materials on September 30—after the September 26 due date of defendants' final *brief* on the motions to dismiss.[2] But because those supplemental materials (referred to here by the same Exhibit designations that are contained in plaintiffs' new filing) plainly afford plaintiffs no substantive help,[3] this supplement to the Opinion will address them in the brief compass needed to show why that is so.

To begin with, Exs. B and C reflect (1) that the predecessor in interest of name plaintiff Evelyn Ruebner was a United States national when his property was confiscated by Nazi Germany (not by Poland, although the part of Germany where the property was located became part of Poland after World War II, and the property was assertedly nationalized by Poland in 1946 or thereafter) and (2) that the predecessor in interest of the first name plaintiff (Edward Haven) might also have been a United States national at the time of expropriation of the predecessor's property. But it takes only a moment to see that counsel has totally missed the point in those terms.

That is so because this Court has not, as Motion at 2 says, "found that none of the Plaintiffs' claims were settled by the Treaty of 1960 because none of the Plaintiffs were U.S. nationals when Poland expropriated their property." Instead Opinion at 9 had simply *assumed* that to be the case because that was the tenor of the parties' submissions at that stage—but even more importantly, because of the tautology that if any plaintiff or his or her predecessor was indeed within the scope of the Treaty, the claim of that plaintiff would be barred by the Treaty's express terms. So all that

---

**19.** This dismissal of course moots the name plaintiffs' motion for class certification.

**1.** All terms defined in the Opinion will be referred to in the same way here, without any need for redefinition.

**2.** Needless to say, plaintiffs' counsel is entitled to an apology for that oversight. This Court's in-chambers recordkeeping system had inadvertently recorded only the *briefing* timetable, thus having failed to pick up on the added provision permitting plaintiffs' submission of supplemental factual materials.

**3.** It was implicit in the Opinion's analysis, and is equally implicit here, that this Court's consideration of defendants' Fed.R.Civ.P. ("Rule") 12(b)(1) motions to dismiss for lack of subject matter jurisdiction—unlike its role in ruling on a Rule 12(b)(6) motion—is not constrained by the boundaries of the Complaint's allegations (see, e.g., *Calderon v. United States*, 123 F.3d 947, 951 n. 2 (7th Cir. 1997); and see generally 2 James W. Moore et al., *Moore's Federal Practice* ¶ 12.30[3] and [4] (Milton I. Shadur, author) (3d ed.1998)). Because this supplement (like the Opinion) does draw on factual information tendered by the parties outside of the Complaint, it may be worth making that implicit proposition explicit for the sake of both clarity and completeness.

need be said on that score is that if and to the extent that the Treaty is applicable rather than inapplicable to any plaintiff, that plaintiff's claim is dead in the water to begin with.[4]

 Next, Ex. D is an affidavit from an American lawyer, the former Chairman and Chief Judge of the Foreign Claims Settlement Commission of the United States in which he states, as Motion at 3 puts it, that during his tenure in that capacity "he believed that the types of claims that form the basis of the instant action were legitimate." That may well be so (see this Court's expressions on that subject in Opinion at 956–57), but it is of course totally irrelevant to the subject matter jurisdictional issue that binds this Court and that has compelled dismissal. And to the extent that the lawyer's affidavit also seeks to leap from the notion that Polish Consulates in the United States have engaged "in the protection of the rights of Polish national heirs, beneficiaries and legatees, in estate cases filed in probate courts in the U.S." to the conclusion that "by extension, one could well assume that such consuls in reality *do represent and speak for* the Government of Poland in all matters relating to legal issues" (emphasis in the affidavit itself), that is a total nonsequitur when it comes to the question of any claimed waiver, by any Polish consular people, of the sovereign immunity of the Polish government itself.[5]

 All of the remaining exhibits (Exs. E, F and G) offer absurd notions of what amounts to doing business in the United States—whether purported activity by Treasury and PZU in assertedly attempting to block a merger *in Poland* of a Polish bank that maintains a representative office in New York, or an affidavit in the English language that PZU maintains on the Internet (describing its *Polish* in-

surance activities), or a 50–50 joint venture agreement between Warta and a *Polish* subsidiary of Citibank to set up a pension fund in *Poland*. Those contentions are so outre as to disqualify them from being dignified by the label of "legal arguments."

Finally, plaintiffs' counsel again misses the point entirely in stating (Motion at 4):

> The Court ruled that it cannot act because of limits on equitable remedies as relating to foreign sovereignty. The Plaintiffs requested damages from defendants as well as equity. This Court may grant remedies at law as to foreign sovereigns.

Everything said in the Opinion was of course addressed to the impermissibility of advancing *any* claims against defendants because of sovereign immunity—and *any* claims would of course extend to those labeled "at law" as well as "in equity." What Opinion at 957 went on to state is simply the added point that no general notions of equitable jurisprudence could override that immunity either.

In sum, nothing in plaintiffs' most recent submission makes a particle of difference in the analysis or the conclusions set out in the Opinion. Plaintiffs' motion for reconsideration and for vacation of the September 29 dismissal is denied.

### SECOND SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

Just after this Court issued its September 29, 1999 memorandum opinion and order ("Opinion") in this action, one of this Court's law clerks was told by Elyse Krug Miller ("Miller")—the daughter of Dr. Mark Krug, one of the name plaintiffs who was added in the First Amended Class Action Complaint ("Complaint") in this action—that plaintiffs' counsel Eric Puchala ("Puchala") assertedly had no authority to represent Dr. Krug. Because this Court

---

4. What the Opinion addressed was plaintiffs' very different argument about the scope and effect of the Treaty on claimants who were *not* within its terms. That totally groundless argument has been scotched by Opinion at 951–52.

5. In that regard, Opinion at 952–54 has already identified the total unpersuasiveness of the arguments by plaintiffs' counsel regarding waiver—either express or implied—by the actual conduct ascribed to persons affiliated with the Polish Consulate.

then had occasion to issue its October 4, 1999 Supplement to Memorandum Opinion and Order ("Supplement"), it complied with the obligation imposed by *In re Himmel* in light of that claim by adding a footnote 6 to the Supplement addressing the subject of Miller's statement and its potential impact on Puchala.

Now the attorneys who represent Puchala, making proper use of the express exception to maintaining clients' confidences or secrets that is provided by this District Court's LR 83.51.6(c)(3)[1] where an accusation of wrongful conduct has been made against a lawyer, have provided information that expressly contradicts Miller's assertion. In turn Miller (herself a lawyer, being listed in the current *Sullivan's Law Directory* as an Assistant Public Defender in the Appellate Division of that office) responded with her version of events. Since then there has been a continuing flurry of faxes, each further staking out the sender's point of view on the matter, and culminating with Dr. Krug's own October 7 handwritten letter to this Court and Miller's most recent October 12 letter.

This supplement will shortly turn to an explanation of why this Court need not resolve the differences between the parties in any definitive way—but first it must be said that one thing that emerges clearly from the competing versions is that although Miller does not *want* Puchala to represent Dr. Krug, and although Dr. Krug says in his current letter that he did not give Puchala permission to list him as a plaintiff in this action, Dr. Krug's own prior correspondence with Puchala clouds

the picture. From the documents that have been transmitted to this Court by Puchala's counsel, which reflect back-and-forth communications between Puchala and Dr. Krug and between Puchala and Miller that date back over a year, what appears is that although Dr. Krug had signed a power of attorney in favor of his daughter Miller in March 1999 he then— nearly four months later, in mid-July 1999—faxed Puchala this letter in his own handwriting:

> Dear Mr. Puchala:
>
> I would like to resume our contact.
>
> Please send me the contract you have formulated on July 25, 1998 and I will promptly return it.
>
> Sincerely yours,
>
> Mark M. Krug
>
> P.S. My daughter is aware of my writing you this letter.[2]

And the final word then came via Puchala's self-explanatory July 30, 1999 letter response to Dr. Krug (photocopy attached).[3]

For her part, Miller urges in her most recent (October 12) letter that "there was clearly no 'meeting of the minds' between the parties and no valid contract." To that end she points to a late July 1998 exchange of correspondence in which Puchala had unsuccessfully sought a change in terms because "his expenses were greater than he thought." But that suggested change was embodied in "the contract you have formulated on July 25, 1998" about which Dr. Krug wrote Puchala almost a year later—apparently without telling Miller—that he now *did* want to sign. When instead of that Puchala wrote back that the earlier-signed agreement "is sufficient" if

---

**1.** That LR corresponds exactly to the Illinois Supreme Court's Rule of Professional Responsibility 1.6(c)(3).

**2.** [Footnote by this Court] One of Miller's faxed communications directed to this Court's chambers says that her father "had never told me he had actually written to Mr. Puchala and I have never seen this letter until it was faxed to me this morning." And Dr. Krug's October 7 letter says that his postscript was not true, though he had planned to send his daughter the requested new contract for re-

view when he received it (as he had asked in his July 1999 letter). This Court is not about to conduct an investigation into the odd-sounding situation revealed by that inconsistency, just as it is not going to delve at any depth into the Miller–Puchala quarrel.

**3.** Puchala's reference to "the agreement we already have" and "the agreement that we each have signed" refers to the detailed four-page Attorney–Client Contingent Fee Contract that was signed by Krug on June 13, 1998 and then by Puchala on July 20, 1998.

Dr. Krug did not "want to repudiate the agreement we already have" and when Dr. Krug then did not respond, Puchala can scarcely be faulted for *his* belief that they *now* had a "meeting of the minds"—a contract.[4]

What Puchala has *not* explained, however, is how he possessed the authority to act as he did a month earlier, when he filed the Complaint on *June* 24 of this year with Dr. Krug as a newly-added plaintiff. Metaphysical expressions such as "meeting of the minds" tend to muddy the waters of contract analysis, for it is not just what is inside either party's head but rather the parties' *communicated* intent (normally viewed from an objective, rather than purely subjective, perspective) that serves to define the presence or absence of a contractual relationship. And here it seems that Puchala did what he did a month before Dr. Krug had clarified what previously appears to have been a less-than-clear situation. As for the issue of Dr. Krug's possible ratification through the July 1999 exchange of correspondence, it is not this Court's function in this now-closed litigation to resolve any quarrel the parties may still have between themselves.

On that score, Miller's views as to Puchala's claimed lack of authority (which

she says had been confirmed by attorneys she has consulted) were arrived at in ignorance of her father's and Puchala's July 1999 exchange of letters. Again it is not this Court's role to adjudicate just where the total facts, and not just those originally known to Miller, left the parties' relationship.

It would thus be an understatement to characterize the situation as murky. But to return to the area of this Court's proper involvement, it would appear that what is *not* called for under the circumstances is any public aspersion—in ethical terms—on Puchala's conduct in having added (and then having retained) Dr. Krug as a party plaintiff.[5]

This Court therefore feels obligated to exercise its best efforts to undo—or at least to minimize—any potential harm caused by the inclusion of n. 6 in the Supplement. It therefore (1) strikes n. 6, (2) directs both Lexis and Westlaw to delete that footnote from their electronically-retrievable versions of the Supplement and (3) is transmitting to West Publishing Company, for the anticipated joint publication of the original opinion and the Supplement, an appropriately redacted version of the Supplement without n. 6.[6]

---

**4.** In that light, Dr. Krug's current letter's claim of a claimed lack of permission, or a claimed lack of notification, regarding his addition to this lawsuit, somewhat reflects a layman's lack of understanding—the mutually signed agreement would have conferred the necessary authority, and in that respect no further notification would have been needed.

**5.** Dr. Krug's October 7 letter says in part:

I am aware that Mr. Puchala states that he did inform me in a letter about the suit. I am not questioning his veracity but have *neither seen or read* such a notification.

Around the time that the suit was apparently filed, my wife fell victim to Alzheimer's illness and my mind was, and is, totally preoccupied with that affliction.

**6.** Unlike the apprentice in Dukas' *Sorcerer's Apprentice* (or Mickey Mouse in the cartoon-plus-symphony-orchestra version of that composition in Walt Disney's *Fantasia*), this Court has the ability to stem the seemingly endless (and really unbidden) flow of "he said, she said" communications from the disputants. No further letters or filings on the subject will be entertained.

962

# ERIC V. PUCHALA
ATTORNEY AT LAW·
134 North LaSalle Street, Suite 2204, Chicago, Illinois 60602
Phone: (312) 641-3040, Fax: (312) 641-3041

July 30th, 1999

Dr Mark Krug
780 Adobe Drive
Santa Rosa, CA 95404

Dear Dr. Krug:

Thank you for your letter of July 17th, 1999. There is no need to sign a new contract unless you want to repudiate the agreement we already have. Please let me know if this is what you intend. Otherwise, the agreement that we each have signed is sufficient. I am enclosing a copy of the amended complaint in the case. Please call me or write if you have any questions or comments.

Sincerely,

Eric Puchala

Encl.

